## NOVACK AND RANDALL, *v.* THE NATIONAL HOT ROD ASSOCIATION

[No. 476, September Term, 1966.]

*Decided July 3, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*Paul H. Mannes* with whom was *Peter A. Greenburg* and *Bernstein, Kleinfeld & Alper* on the brief, for appellants.

*Thomas A. Farrington,* with whom were *Hal C. B. Clagett* and *Sasscer, Clagett, Powers and Channing* on the brief, for appellee.

HAMMOND, C. J., delivered the opinion of the Court.

The issue before us is whether The National Hot Rod Association (Hot Rod), a non-profit California corporation which sponsors and regulates automobile drag races, had sufficient contacts with Maryland to make it legally and constitutionally amenable to suit in Maryland on a cause of action related to its corporate activities in the State (a suit by an automobile drag race driver who had been injured on a track sanctioned as safe by Hot Rod and a similar suit by the widow of a deceased driver).

Hot Rod is "a drag racing organization," which organizes and sponsors four automobile speed race meetings a year, at which it hires its own personnel, buys its own insurance and is fully responsible for running the racing meetings.[1] It has never

---

1. The owner of the dragstrip described drag racing as follows: "It is two cars start[ing] from a standstill position to race a

sponsored such a meet in Maryland. In addition to this activity, Hot Rod sells individual memberships of $8.00 a head and, for a fee of $25.00 for each event sanctioned by it, gives its official blessing to those automobile race tracks throughout the country which meet its standards, specifications and regulations as to the construction, operation and maintenance of such tracks. It authorizes and permits the fact that it has sanctioned an automobile racing event to be publicized in various ways and in various media to contestants, spectators and the public. Darwin Doll testified that he was the director of the Northeast Division of Hot Rod with headquarters in York, Pennsylvania, and that Maryland is in the Northeast Division. He described Hot Rod's methods of operation in terms of the Aquasco Track, the only track in Maryland sanctioned by Hot Rod: Aquasco applied to his predecessor Hot Rod area representative and he assumed the track was inspected by that representative before it was first sanctioned because "they all are." He testified that the act of sanctioning takes place in California. He said: "I send a letter of recommendation after my inspection of the track to the Los Angeles office, who thereby initiates the sanction." The track has been inspected by Doll on four occasions—October 1964, March 1965, July 1965 and October 1965. He made these periodic visits "to see that they [the Aquasco Track] are running according to our rules * * *. That is the purpose of the N. H. R. A. sanction." He added that if the track did not meet Hot Rod standards, they would not have its signs in large letters bearing the legend "N. H. R. A. Sanctioned" on their door or on their tower. Each track sanctioned must maintain "minimum acceptable insurance standards" and buy specified kinds and amounts of insurance covering the track and Hot Rod

---

quarter of a mile [at speeds up to 200 miles per hour] against time, elapsed time and mileage." The course is "straightaway" and "sort of level all the way." (The plaintiffs allege that the track in question was not level and this was a cause of their misfortunes.) The cars used may be anything from standard cars to dragsters. A dragster is "low, got big tires * * * in the back, about twelve inch tires in the back, and its got small tires in the front * * *. [It rides] about four or five inches off the ground * * *. Some of them are about three inches."

("For the protection of the Association. They are using our name."). At least five days before a racing meet the track sends an application for sanction and the fee of $25.00. Hot Rod's division area representative then, it would appear from Doll's testimony, inspects the track and sends his report to California and, on the basis of this report, Hot Rod sanctions or refuses to sanction the proposed meet.

Hot Rod publishes "The National Dragster Newspaper" to promote the activities of the Association for its members. In the paper there is listed the membership of the National Hot Rod Association. They sometimes sell the papers to sanctioned tracks which resell them.

It is alleged in the declarations in the suits against the owners and operators of the Aquasco Track and Hot Rod that both the injured driver and the deceased driver relied on the representations made by Hot Rod's sanction that the Aquasco Track was safe and fit for "drag racing" at whatever speed might be obtained, that in fact it was not, but was dangerous and unsafe and that, as a result, one driver was killed and one badly hurt.

Service of process was made on Hot Rod in Los Angeles by the sheriff of Los Angeles County. Hot Rod moved to quash service and testimony was taken. Hot Rod argued that it has no office, sells no product, makes no contract, employs no person, conducts no races, solicits no business, conducts no negotiations, conducts no advertising and has neither a mailing address nor a corporate agent in Maryland and therefore was not amenable to suit in Maryland. Judge Parker, seemingly considering essentially whether Hot Rod was "doing business" in Maryland, decided that it was not and quashed service.

In 1964 the Legislature enacted Ch. 95 of the Laws of that year, now codified as §§ 94 to 100 of Art. 75 of the Code under the subtitle "Bases of Personal Jurisdiction over Persons Outside This State." We pointed out in *Gilliam v. Moog Industries, Inc.*, 239 Md. 107, 111:

> "It seems clear that the purpose of the Legislature
> in enacting these new provisions was to give the courts
> of the State personal jurisdiction over all out of state
> persons and corporations which constitutionally could

be reached as having had sufficient Maryland contacts, under the jurisdictional yardstick established by the Supreme Court in cases such as *International Shoe Co. v. Washington,* 326 U. S. 310, 90 L. Ed. 95; *McGee v. International Life Ins. Co.,* 355 U. S. 220, 2 L. Ed. 2d 223; and *Hanson v. Denckla,* 357 U. S. 235, 2 L. Ed. 2d 1283."

In *Van Wagenberg v. Van Wagenberg,* 241 Md. 154, 164-65, in dealing with New York's similar statutory provision for jurisdiction where the defendant "transacts any business within the State," Judge Oppenheimer, for the Court, quoted approvingly the language of Judge Fuld for the Court of Appeals of New York in *Longines-Wittnauer Watch Co. v. Barnes & Reinecke,* 209 N. E. 2d 68, 75 :

> " 'In enacting * * * [the long-arm statute], the Legislature chose not to fix precise guidelines, * * * and decided, instead, to follow the broad, inclusive language of the Illinois provision, adopting as the criterion the "transact[ion of] *any* business within the state." The design of the legislation, as expressed by the committee, was to take advantage of the "new [jurisdictional] enclave" (*Bomze v. Nardis Sportswear,* 165 F. 2d 33, 36, per L. HAND, J.) opened up by *International Shoe* where the nonresident defendant has engaged in some purposeful activity in this State in connection with the matter in suit.' "

The recent decisions of the Supreme Court which have held that one outside the State need not have been doing business in the State to be subject to suit in the State have established criteria for measuring the increased amenability to local suit.

In *International Shoe Co. v. Washington,* 326 U. S. 310, 90 L. Ed. 95, the Supreme Court said:

> "Due process requires only that in order to subject a defendant to a judgment in personam, if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance

of the suit does not offend 'traditional notions of fair play and substantial justice' "

and

"Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure;"

and

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue."

In *Hanson v. Denckla,* 357 U. S. 235, 2 L. Ed. 2d 1283, 1298, it was stated:

"It is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws."

See also *McGee v. International Life Insurance Co.,* 355 U. S. 220, 2 L. Ed. 2d 223.

In our view Hot Rod clearly is legally and constitutionally amenable to suit in Maryland. Section 96 of Art. 75 provides that a court of Maryland may exercise personal jurisdiction over one as to a cause of action arising from that one's

"(1)  transacting any business in this State;
* * *
(3)  causing tortious injury in this State by an act or omission in this State;
(4)  causing tortious injury in this State by an act

or omission outside the State if he regularly does or solicits business, *engages in any other persistent course of conduct in this State* or derives substantial revenue from food or services used or consumed in this State * * *." (Emphasis added)

Hot Rod's only activities, as far as the record discloses, are itself running four drag race meets a year and for a fee promoting and seeking to insure the safe and successful conduct of other drag race events by imposing its standards, rules and regulations as a prerequisite to its stamp of approval. In order to achieve its aims and purposes, its agents make personal inspections of tracks before they are sanctioned, and the granting or withholding of a sanction depends upon the activity of the agent in making the inspection. If Hot Rod sanctions a race meet it allows that fact to be publicized within the State in which the meet is held and thus, it may be inferred, gives prestige and material benefit—by attracting participants in and paying spectators of the meet—both to the track and to itself since in the latter instance it achieves and fulfills its aims and purposes.

Hot Rod, we think, transacted some business in Maryland within the meaning of the statute when in response to a request from the management of Aquasco Track its regularly employed agent inspected the track and certified it as in accord with Hot Rod's standards so as to merit Hot Rod's sanction and the right to publicize that sanction, for both Aquasco's and Hot Rod's benefit. We held in *Van Wagenberg* that the acts done within a State which will support in personam jurisdiction as transacting "any business" are not necessarily limited to acts which are a part of commerce or of transactions for profit, but include acts which constitute a purposeful activity within the State.

Hot Rod argues that its contracts with Aquasco were made in California. This is not decisive. *Van Wagenberg* pointed out what *Longines-Wittnauer,* 209 N. E. 2d at 75, held, that

"* * * even though the last act marking the formal execution of the contract may not have occurred within [the State], the statutory test [of transacting any business] may be satisfied by a showing of other pur-

poseful acts performed by the appellant in this State in relation to the contract, albeit preliminary or subsequent to its execution."

We think also that Hot Rod, in the context of its overall activities, engaged in a persistent course of conduct in Maryland in sending its agent into the State on five occasions within a period of little more than a year to inspect and certify the Aquasco Track and that, therefore, if the act or omission of Hot Rod was a proximate cause of the injuries complained of it would be subject to suit here. The testimony is that the recommendation of safety and compliance with Hot Rod's rules and regulations by Hot Rod's agent on the scene were prerequisites to the local track being sanctioned as safe. Hot Rod, the claimants allege, sanctioned the race meeting at which the drivers were hurt by reason, the claimants say, of the unsafe and faulty condition of the track. It appears to follow that Hot Rod's agent either made a faulty and mistaken recommendation or Hot Rod sanctioned the meet without any or a dubious recommendation. The giving of the sanction which, it is alleged, brought about the damages sued for, could have been an act or omission in California of one who had engaged in a persistent course of conduct in Maryland or an act or omission in this State by Hot Rod's inspector.

On the record we think Hot Rod engaged in purposeful activity in Maryland and that its contacts within the State were more than the minimum that meets the requirements of due process and such as not to offend traditional notions of fair play and justice.

*Order reversed, with costs, and case*
*remanded for further proceedings.*