McCORMICK & COMPANY, Incorporated, a body corporate of the State of Maryland

v.

BEDFORD INDUSTRIES, INCORPORATED, a body corporate of the Commonwealth of Virginia, successor to and formerly known as Childers Foods, Incorporated, a body corporate of the Commonwealth of Virginia; Earl L. Childers, individually and as director and stockholder of Bedford Industries, Inc.; Ethel Y. Childers, individually and as director and stockholder of Bedford Industries, Inc.; Marion Young, as director of Bedford Industries, Inc.; Eliza Childers, as stockholder of Bedford Industries, Inc.

Civ. No. 20575.

United States District Court
D. Maryland.
June 25, 1969.

William L. Marbury, Joseph H. Young and Paul V. Niemeyer, Baltimore, Md., for plaintiff.

Norman P. Ramsey and Cleaveland D. Miller, Baltimore, Md., for defendants.

THOMSEN, Chief Judge.

In this civil action plaintiff seeks rescission of a contract of sale and modification thereof, return of certain stock and damages, alleging that fraudulent representations by defendants induced plaintiff to make the contract. The principal contract was between McCormick & Company, Inc. (plaintiff) on the one hand and three of the defendants, Earl Childers, his wife Ethel and Childers Foods, Inc., on the other. Earl's mother Eliza, a stockholder of the corporation, and Marion Young, a director of the corporation, are also named defendants.

Plaintiff is a Maryland corporation. All individual defendants are citizens of

Virginia except Marion Young, who is a citizen of Kentucky. Childers Foods, Inc., a Virginia corporation, having its principal place of business in Bedford, Virginia, later changed its name to Bedford Industries, Inc., but it will be referred to herein as Childers Foods. A few days before this suit was filed it was dissolved, but may still be sued in its corporate name. See Code of Virginia, Title 13.1–101 (1956); United States v. Village Corporation, 298 F.2d 816 (4 Cir. 1962).

The complaint contains four counts.[1] Counts I, II and III are based upon the common law of Maryland. The complaint bases jurisdiction over those counts on diversity of citizenship and the requisite amount in controversy. Jurisdiction over the fourth count of the complaint, arising out of § 10(b) of the Securities Exchange Act of 1934, and Rule 10(b)–5 promulgated thereunder by the Securities and Exchange Commission, is invoked under 15 U.S.C. § 78aa, which grants this Court jurisdiction over suits brought under the Securities Exchange Act, and also under 28 U.S.C.A. § 1331, based on the federal question involved and the amount in controversy.

Defendants have filed the following motions:

(A) a motion to dismiss the complaint for failure to join an indispensable party;

(B) a motion to dismiss Counts I, II and III for lack of jurisdiction over the subject matter;

(C) a motion to dismiss Count IV for failure to state a claim upon which relief can be granted; and

(D) a motion to quash service of process on all defendants as to Counts I, II and III.

In ruling on the motion to dismiss for failure to state a claim upon which relief can be granted, the Court has considered only the allegations of the complaint. In ruling on the other motions the Court has also considered the affidavits filed on behalf of the respective parties.[2] There is little or no dispute as to where the transactions took place and who participated in them, although defendants deny the alleged misrepresentations and the legal effect of certain acts. Briefly stated, the facts are as follows:

Early in 1968, Childers Foods operated a chicken processing plant in Bedford, Virginia. Earl Childers and his wife Ethel each owned 40% of the stock of the corporation; each was a director; each served as an officer—Earl as President, Ethel as Secretary.

Ethel also owned a one-acre tract of land in Bedford, Virginia, on which the Childers Foods plant, which she also owned, was built. Earl owned 27 acres of land surrounding this one-acre tract. Earl also owned two patents and one patent application on certain machinery used by Childers Foods in processing chicken products. One of the two patents was later assigned to Childers Foods. Eliza Childers, mother of Earl, owned the remaining 20% of Childers Foods stock. Marion Young was a director of the corporation.

In January 1968 plaintiff received information that the Childers Foods business was for sale. Plaintiff was also informed that Childers Foods had developed a new deboning machine which processed chicken products more efficiently than any other machine yet in use. Plaintiff contacted Earl Childers and began negotiations concerning possible acquisition of Childers Foods by plaintiff. Representatives of plaintiff emphasized to Earl Childers throughout the negotiations that McCormick was principally interested in the deboning machine. Several officials of plaintiff

---

1. A fifth count, based upon the Maryland Securities Act, has been dismissed by plaintiff.

2. Land v. Dollar, 330 U.S. 731, 735, n. 4, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947);

McShan v. Sherrill, 283 F.2d 462, 464 (9 Cir. 1960); Estes v. Shell Oil Co., 234 F.2d 847, 849–850 (5 Cir. 1956).

traveled to Bedford to inspect the Childers Foods plant. Earl Childers herded them away from the area of the plant where the machine was located and refused them permission to inspect the innards of the new machine. He asserted that the interior mechanism was the subject of the patent application which he owned and that it was secret. He represented to plaintiff that the machine was able to produce chicken emulsion efficiently and inexpensively, and that it was responsible for an increase in the production of Childers Foods. Earl also said that Childers Foods enjoyed a good relationship with a very large customer and that nothing indicated that this relationship would not continue.

On February 19, 1968, allegedly as a result of these representations, plaintiff sent Earl Childers a "letter of intent", actually an offer to buy the entire Childers Foods business, including the real property owned by Earl and Ethel, the patent and patent application owned by Earl, and the assets and goodwill of Childers Foods, all for $3,000,000. The offer was made contingent on a favorable opinion of plaintiff's patent counsel as to the patentability of the new Childers deboning machine, described and claimed in the patent application, a copy of which was furnished plaintiff. Subsequently, Earl Childers conferred with plaintiff's patent counsel and repeated to them the representations he had made to the plaintiff's officials who had visited Bedford earlier. He also told patent counsel that the mechanism described in the patent applications was critical to the operation of the machine then being used by Childers Foods in the production of chicken emulsion. Based on these representations, patent counsel gave plaintiff their opinion that the invention claimed by Earl Childers was critical to the machine's operations and was patentable.

On March 3, 4 and 5, 1968, Earl and Ethel Childers, representing themselves and Childers Foods, and allegedly the other two defendants, visited plaintiff's headquarters in Baltimore. They discussed some details about the pending contract of sale, questions about title to various patents and patent applications used in the Childers Foods business, and Earl's request that part of the consideration for the contract be stock in plaintiff. During the visit, meetings were held to acquaint the Childers with various McCormick personnel, and to enable those officials to evaluate the Childers and their business.

On March 15, 1968, Childers Foods, Earl Childers and Ethel Childers entered into a contract of sale with plaintiff on the terms described above. Earl and Ethel Childers signed the contract in Washington, D. C. Performance was to take place in Baltimore on April 1, 1968. On that date Earl and Ethel Childers came to plaintiff's offices in Baltimore, where they performed the contract by delivering to McCormick Foods, Inc.,[3] as designees of plaintiff, appropriate papers conveying the real property and transferring the patents and other assets to plaintiff. Plaintiff paid them $2,500,000 of the purchase price. The remaining $500,000 consideration was to be paid to Earl Childers one year after the closing date. Later in April, 1968, pursuant to an agreement modifying the March 15 contract, Earl Childers again visited Baltimore to receive 4,500 shares of McCormick stock valued at $248,000, as part of the $500,000 remaining to be paid him under the March 15, 1968, contract.

At the time of the closing on April 1, 1968, plaintiff believed that it had purchased a chicken deboning machine which incorporated and used the invention described and claimed in Earl Childers' patent application and that the invention was essential to the production of chicken emulsion. Sometime between late August and late October, 1968, plaintiff and McCormick Foods first learned that

---

3. McCormick Foods, Inc. was a wholly-owned subsidiary incorporated in Virginia by plaintiff for the purpose of taking title to the assets acquired in this sale.

the machine did not incorporate and use the invention described and claimed in the patent application formerly owned by Earl Childers, but that the machine was no more than a standard food pulper worth far less than the sums plaintiff had paid. Plaintiff also learned that the assurances given plaintiff by Earl Childers with respect to the large customer of Childers Foods were not true.

### A. Indispensable Party

Defendants contend that McCormick Foods, Inc., a Virginia corporation, is an indispensable party, that it should be joined as a party plaintiff, and that such joinder would destroy diversity jurisdiction. On the other hand, plaintiff asserts and the present record shows that plaintiff created McCormick Foods as a wholly-owned subsidiary of plaintiff to take title to the properties and to operate the business which plaintiff purchased from defendants; that the complaint filed herein is based upon alleged misrepresentations made to plaintiff, upon which plaintiff relied to its damage; that plaintiff is therefore the real party in interest within the meaning of Rule 17, F.R.Civ.P., and that McCormick Foods is not an indispensable party within the meaning of Rule 19.

Plaintiff is clearly the real party in interest.[4] Defendants concede that plaintiff is a proper party to bring this suit and that McCormick Foods is not an indispensable party with respect to plaintiff's claim for damages. Defendants contend, however, that McCormick Foods is an indispensable party with respect to the claim for rescission. The issue turns on the proper application of the principles stated in Rule 19, as amended effective July 1, 1966, 28 U.S.C.A.

The development of the indispensable party doctrine is discussed at length in the Notes of the Advisory Committee on Rules, supra. The purpose and effect of the 1966 Amendment was summarized in note 12 to the opinion of the Supreme Court in Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 116, 117, 88 S.Ct. 733, 741, 742, 19 L.Ed.2d 936 (1968), the material portions of which are set out in note 5[5] in the mar-

---

4. Prudential Oil and Minerals Company v. Hamlin, 277 F.2d 384 (10 Cir. 1960); Farm Bureau Cooperative Mill and Supply, Inc. v. Blue Star Foods, Inc., 238 F.2d 326 (8 Cir. 1956); Fox v. Hirschfeld, 157 App.Div. 364, 142 N.Y.S. 261 (1913); Galarza v. Union Bus Lines, Inc., 38 F.R.D. 401 (S.D.Tex.1965), aff'd 369 F.2d 402 (5 Cir. 1966); Ettar Realty Company v. Cohen, 163 App.Div. 409, 148 N.Y.S. 625 (1914). See also Insurance Co. of North America v. United States, 159 F.2d 699, 702 (4 Cir. 1947).

5. "The new text of the Rule was not intended as a change in principles. Rather, the Committee found that the old text 'was defective in its phrasing and did not point clearly to the proper basis of decision'. This Court, having the ultimate rule-making authority subject to congressional veto, approved the Committee's suggestions. Where the new version emphasizes the pragmatic consideration of the effects of the alternatives of proceeding or dismissing, the older version tended to emphasize classification of parties as 'necessary' or 'indispensable'. Although the two approaches should come to the same point, since the only reason for asking whether a person is 'necessary' or 'indispensable' is in order to decide whether to proceed or dismiss in his absence and since that decision must be made on the basis of practical considerations, Shaughnessy v. Pedreiro, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868, and not by 'prescribed formula,' Niles-Bement-Pond Co. v. Iron Moulders Union, 254 U.S. 77, 41 S.Ct. 39, 65 L.Ed. 145, the Committee concluded, without directly criticizing the outcome of any particular case, that there had at times been 'undue preoccupation with abstract classifications of rights of obligations, as against consideration of the particular consequences of proceeding with the action and the ways by which these consequences might be ameliorated by the shaping of final relief or other precautions.' An excellent example of the cases causing apprehension is Parker Rust-Proof Co. v. Western Union Tel. Co., 2 Cir., 105 F.2d 976. Judge Swan, writing for a panel that included Judges L. Hand and A. N. Hand, stated that a nonjoined person was an 'indispensable' party to a suit to compel issuance of a patent, but went on to say that 'as the object of the rule respecting indispensable parties is to accomplish justice between all the parties in interest,

gin hereof. That case discussed and applied the principles set out in Rule 19, as now in effect.

The applicable parts of Rule 19 read as follows:

"Rule 19. Joinder of Persons Needed for Just Adjudication

"(a) Persons to be Joined if Feasible. A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in his absence complete relief cannot be accorded among those already parties, or (2) he claims an interest relating to the subject of the action and is so situated that the disposition of the action in his absence may (i) as a practical matter impair or impede his ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk or incurring doubt, multiple, or otherwise inconsistent obligations by reason of his claimed interest. If he has not been so joined, the court shall order that he be made a party. If he should join as a plaintiff but refuses to do so, he may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and his joinder would render the venue of the action improper, he shall be dismissed from the action.

"(b) Determination by Court Whenever Joinder not Feasible. If a person as described in subdivision (a) (1)–(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to him or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

 Since McCormick Foods holds title to the property transferred by defendants pursuant to their contract with plaintiff, and the rescission prayed cannot be made effective without its transferring those properties back to defendants, it appears that McCormick Foods is a party which, under ¶ (a) of Rule 19 should be joined if feasible. Since its joinder is not feasible,[6] the Court must "determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent party thus being regarded as indispensable".

 The factors listed in ¶ (b) may be considered together in this case. Concededly, McCormick Foods is not an indispensable party with respect to plaintiff's claims for damages. With respect to the claims for rescission, McCormick Foods would have to execute and deliver appropriate papers to retransfer certain assets, and possibly to take other appro-

---

courts of equity will not suffer it to be so applied as to defeat the very purposes of justice.' Id., at 980. On this basis, the Court of Appeals reversed the District Court's dismissal of the action for nonjoinder. Under the present version of the Rule, the same result would be reached for, ultimately, the same reasons. The present version simply avoids the purely verbal anomaly, an indispensable person who turns out to be dispensable after all." 390 U.S. at 116, 117, 88 S.Ct. at 741, 742.

6. If it were joined as an involuntary plaintiff, diversity would be destroyed. It could be joined as a defendant, so that the Court might require it to execute and deliver any documents necessary to effect a possible rescission, but defendants would then argue, no doubt successfully, that it should be realigned as a party plaintiff.

priate action. Since McCormick Foods is a wholly-owned subsidiary of plaintiff, plaintiff can require it to take such action. The interests of McCormick Foods in this case are fully protected by plaintiff, and defendants' interests may be fully protected by appropriate "provisions in the judgment, by the shaping of relief", i. e., by providing that any right of rescission granted plaintiff shall be conditioned upon plaintiff causing McCormick Foods to perform whatever acts may be required. In these circumstances, "equity and good conscience" indicate that the action should proceed among the parties before the Court, and that McCormick Foods is not an indispensable party, as that term is used in Rule 19(b), as amended. See Harman v. Forssenius, 380 U.S. 528, 537, n. 14, 85 S.Ct. 1177, 14 L.Ed.2d 50 (1965); Insurance Company of North America v. United States, 159 F.2d 699, 702 (4 Cir. 1947); Jamison v. Memphis Transit Management Company, 381 F.2d 670, 676, n. 6 (6 Cir. 1967); American Plan Corporation v. State Loan and Finance Corporation, 278 F.Supp. 846 (D.Del. 1968).[7]

## B. Jurisdiction

1. *Diversity Jurisdiction.* Since McCormick Foods is not an indispensable party within the meaning of Rule 19, there is complete diversity of citizenship as well as the requisite amount in controversy. Federal jurisdiction therefore exists under 28 U.S.C.A. § 1332.

2. *Pendent Jurisdiction.* As a second string to its bow, plaintiff argues that the doctrine of pendent jurisdiction will support federal jurisdiction over the first three counts, since there is undoubted federal jurisdiction over Count IV. Count IV is against Earl Childers alone, and is based on the issuance to him of some stock in plaintiff as the result of a supplemental agreement between Earl and plaintiff modifying the original contract. See statement of facts above.

The doctrine of pendent jurisdiction would probably support the claims of plaintiff against Earl alleged in the first three counts, although it would be a case of the tail wagging the dog. United Mine Workers v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); Rumbaugh v. Winifrede R. R. Co., 331 F.2d 530 (4 Cir. 1964); Jacobson v. Atlantic City Hospital, 392 F.2d 149 (3 Cir. 1968).

The doctrine might also support the claims alleged in those counts against Childers Foods and Earl's wife, Ethel, although that would stretch the doctrine near or beyond the breaking point. The doctrine cannot reasonably support the claims against the other two defendants. However, because of the decisions made in sections A and D of this opinion, it is not necessary to decide to what extent the doctrine of pendent jurisdiction might apply in this case.

---

7. The case of Lang v. Colonial Pipeline Company, E.D.Pa., 266 F.Supp. 552, aff'd 383 F.2d 986 (3 Cir.1967), upon which defendants rely, was decided after the 1966 Amendments to Rule 19. *Lang* was decided, however, before the decision of the Supreme Court in Provident Tradesmens Bank & Trust Co. v. Patterson, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), and followed the decision of the Third Circuit in *Provident Bank*, which was reversed by a unanimous opinion of the Supreme Court. *Lang* is distinguishable from the case at bar. In *Lang*, a subsidiary corporation held title to a disputed interest in plaintiffs' land in and under which the corporation had constructed a pipeline. The subsidiary had been authorized specifically by the Public Utilities Commission of Pennsylvania to acquire land and/or easements by eminent domain, if necessary, for the construction of that pipeline. Taking all factors into consideration, the Court in *Lang* decided that the subsidiary was an indispensable party, on the grounds "that any judgment rendered would be prejudicial to Colonial of Pennsylvania in its absence; that the prejudice could not be avoided by any shaping of the relief; that any judgment rendered in its absence would be inadequate; and that the plaintiff would have an adequate remedy in the state courts since both companies are amenable to service of process there." 266 F.Supp. at 554.

### C. Count IV

Count IV does not purport to state a claim against any defendant except Earl Childers, and must be dismissed as to the others. Earl Childers also argues that it does not state a claim against him upon which relief can be granted. He contends that the supplementary agreement, dealing with the issuance to him of stock in plaintiff corporation was a separate and distinct transaction from the original agreement referred to in Counts I, II and III. Taking as admitted for the purpose of this motion the facts alleged in the complaint and the inferences most favorable to plaintiff which may be drawn therefrom, the Court concludes that Count IV sufficiently alleges that the stock transaction was closely related to the sale of the Childers' enterprise to plaintiff and that the stock was obtained by reason of the same representations by Earl Childers which had induced plaintiff to purchase that enterprise. Therefore, the motion of Earl Childers to dismiss Count IV as against him must be denied. See Glickman v. Schweickart and Company, 242 F. Supp. 670 (S.D.N.Y.1965); Cooper v. North Jersey Trust Company, 226 F. Supp. 972 (S.D.N.Y.1964); see also Stockwell v. Reynolds & Company, 252 F.Supp. 215 (S.D.N.Y.1965).

### D. Service of Process

1. *The Maryland Long Arm Statute.* Article 75, § 96 of the Annotated Code of Maryland provides in pertinent part:

"(a) A court may exercise personal jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's

"(1) Transacting any business in this State;

" * * *

"(3) Causing tortious injury in this State by an act or omission in this State;

" * * *

"(b) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him."

The broad purpose of this statute was discussed in Novack v. National Hot Rod Assoc., 247 Md. 350, 231 A.2d 22 (1967), and in Van Wagenberg v. Van Wagenberg, 241 Md. 154, 215 A.2d 812 (1966).

Some of the misrepresentations and concealments relied on occurred in Maryland. More importantly, however, the agreement of March 15 was performed in Baltimore on April 1 by Earl and Ethel Childers individually and by Earl as the president of Childers Foods, by various acts set out in the affidavits which need not be repeated here. Those acts are clearly sufficient to sustain service of process on Earl and Ethel Childers and on Childers Foods under Article 75, § 96, with respect to the claims alleged in Counts I, II and III.

Plaintiff's justification for the service of process on Eliza Childers and Marion Young under the Maryland statute rests upon the bald allegation in the complaint and affidavits that Earl Childers acted on behalf of "the defendants" in making the alleged misrepresentations. Plaintiff states that "Eliza Childers is named defendant as stockholder-distributee of the corporate assets of Bedford Industries, Incorporated, having allegedly received distribution of corporate assets in the face of substantial claims against the corporation", citing Marshall v. Fredericksburg Lumber Company, 162 Va. 136, 173 S.E. 553 (1934). With respect to plaintiff's claim against Marion Young, plaintiff states: "This is not to contend that one director is the agent of another; but rather, one director is the agent of the corporation for imposing liability upon the corporation, and if the corporation dissolves that liability may become the liability of another director." [8]

---

8. Plaintiff argues: "This liabiity is imposed by virtue of Section 13.1–44(c) of the Code of Virginia, a portion of which provides:

"(c) Directors of a corporation who vote for or assent to any distribution of assets of the corporation to its stockholders during the liquidation of the cor-

The claimed liability of Eliza Childers and of Marion Young to plaintiff depends upon the proof of facts not alleged in the complaint nor contained in the affidavits, and which, if true, consisted of acts or omissions after the contract of March 15 was performed on April 1. They should not be required to come to Maryland to defend a claim against them which would require the proof of those facts. International Shoe Co. v. Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945); McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223 (1957); Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958). This is not to say that they will not be barred by a possible decision herein rescinding the contract of March 15 as between plaintiff and Childers Foods. But they are entitled to have the additional facts establishing their individual liability under the Virginia law determined in Virginia if, as appears from the evidence now before the Court, that is where their acts or omissions took place.

*2. Count IV.* The service on Earl Childers with respect to the claim under Count IV was proper under the facts.

*3. Pendent service.* The various decisions made herein make it unnecessary to decide plaintiff's contention that service on the several defendants can be justified under the doctrine of pendent service.

Counsel should agree upon an appropriate order giving effect to these rulings.

poration without the payment and discharge of, or making adequate provisions for, all known debts, obligations, and liabilities of the corporation shall be jointly and severally liable to the corporation and its creditors for the value of such assets which were distributed, to the extent that such debts, obligations and liabilities of the corporation are not paid.

"A director of a corporation who is present at a meeting of its board of directors at which action on a corporate matter is taken shall be presumed to have assented to the action taken unless his dissent shall be entered in the minutes of the meeting or unless he shall file his written dissent from such action with the person acting as the secretary of the meeting before the adjournment thereof or shall forward such dissent by registered mail to the secretary of the corporation within three days after the adjournment of the meeting. Such right to dissent shall not apply to a director who voted in favor of such action."