**Dominic A. PIRACCI, Sr., Mary Violet Piracci, Piracci Construction Company**

v.

**NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM.**

Civ. No. 70–1123–T.

United States District Court, D. Maryland.

Jan. 28, 1971.

George Cochran Doub, Baltimore, Md. (John J. Ghingher, III, Baltimore, Md., on the brief), for plaintiffs.

John J. Loflin, Acting Corporation Counsel of City of New York (J. Lee Rankin, Corporation Counsel, New York City, on the brief), for defendant.

THOMSEN, District Judge.

This is an action seeking specific performance of a commitment agreement for a permanent mortgage loan or, in the alternative, damages for breach of that agreement. Defendant has moved (1) to dismiss the case for lack of personal jurisdiction over it, (2) to quash the return of service of process, and (3) for a change of venue to the Southern District of New York.

The Maryland long arm statute, Art. 75, §§ 94–100, Anno.Code of Maryland (1969 Repl.Vol.), contains the following pertinent provisions, upon which plaintiffs rely:

"§ 96. *Personal jurisdiction over person as to cause of action arising from business, etc., in State.*

"(a) A court may exercise jurisdiction over a person, who acts directly or by an agent, as to a cause of action arising from the person's

"(1) Transacting any business in this State.

"(2)–(6)  *  *  *[1]

"(b) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him.

"§ 97. *Service made outside of State.*

"When the exercise of personal jurisdiction is authorized by this subtitle, service may be made outside this State."

Each side has submitted affidavits setting forth the facts upon which it relies. There is no dispute about the material facts, which may be summarized as follows:

The individual plaintiffs are residents of Maryland and the only stockholders of the corporate plaintiff, a Maryland corporation engaged in the construction business.

Defendant is a New York corporation having its only office in New York City, where it conducts all its business. It provides pension benefits for employees of the City of New York, and maintains several funds, of which the Comptroller of the City of New York is the custodian and which he has the authority to invest. It has no agents, employees or representatives in Maryland and neither owns nor leases any property here. It does not actively solicit mortgage investments, but it holds some 100 mortgages,

[1] Plaintiffs do not now press an argument under any of the other numbered paragraphs of § 96(a). They have abandoned an alternative argument, based on paragraph (5), which reads: "Having an interest in using or possessing real property in this State  *  *  *."

none of which is secured by property in Maryland. It also has outstanding eight mortgage commitments, one of which is the subject of this action; another covers a new post office under construction in Baltimore.

On July 3, 1968, by act of the Comptroller, defendant approved an application submitted to it by a New York broker [2] on behalf of the corporate plaintiff for a first mortgage loan in the amount of $2,640,000, subject to the following conditions, inter alia, set out in the commitment letter: that the loan be evidenced by a note secured by a first mortgage on a Post Office and Vehicle Maintenance Facility to be constructed in Riverdale, Maryland; that the note and mortgage be delivered to defendant on or before November 23, 1969; that the buildings be leased to the United States for an initial term of not less than 30 years, at an annual rental of $250,000, and eight five year renewals at an annual rental of $249,000; that the buildings be constructed according to plans and specifications referred to in the commitment letter; that the construction be supervised by an architect or engineer satisfactory to the Comptroller, at borrower's expense; that an appraisal be furnished, at borrower's expense, by an appraiser designated by the Comptroller; that the borrower pay all costs of the transactions, including legal, appraisal, taxes, survey, recording, title certifications, title insurance premium and other title company charges; that evidence of payment of all taxes, water and sewer rates, assessments, and other prior lien charges be furnished; and that policies of fire and other hazard insurance be purchased from companies and in amounts satisfactory to the Comptroller.

The commitment letter also provided: "The Comptroller's Office will proceed to arrange for an application by the Borrower for a survey of the premises and title insurance with a title company to be designated by the Borrower and approved by the Comptroller. All title insurance commissions are to be paid to the Corporation Counsel of the City of New York."

The corporate plaintiff accepted the commitment and made the good faith payment required by the commitment letter. In July 1968 the individual plaintiffs purchased the property and obtained from a Maryland bank a commitment to provide interim financing for the buildings. In August 1968 defendant consented to an assignment of its commitment for the permanent financing from the corporate plaintiff to the individual plaintiffs.

In October 1968 the individual plaintiffs, the interim lender (the Maryland bank), and defendant entered into a "Buy-and-Sell Agreement", sometimes referred to as "the tripartite agreement". By that agreement defendant agreed to purchase from the bank a promissory note of the individual plaintiffs, secured by a first deed of trust on the property referred to in defendant's commitment letter. The tripartite agreement contained numerous conditions, including compliance by the individual plaintiffs with the conditions set forth in the commitment letter. Thereafter the individual plaintiffs obtained construction loans from the Maryland bank on their promissory note secured by a first deed of trust on the property.

Defendant's only contacts in this matter with the State of Maryland were inspections on three occasions of the premises to be security for the loan: the first, by a New York appraiser, on or about August 7, 1968; the second, by a New York architect-engineer, on April 24, 1969; and the third, by the same architect-engineer, accompanied by a construction inspector from the Comptroller's office, on March 2, 1970. None of these persons resides or maintains an office in Maryland. In each instance they spent one day or part of a day in Maryland and returned to New York.

2. It does not appear that any negotiations leading to the commitment took place in Maryland.

Before December 1, 1969, plaintiffs had completed construction of the buildings and surrendered possession thereof to the United States on the terms required by the commitment and the tripartite agreements. Neither agreement specified a time or place for the closing. Plaintiffs claim that they satisfied all material conditions precedent to the closing, and that they and the Maryland bank were ready, willing and able to close; that defendant first requested a postponement and then refused to close, advising plaintiffs on July 1, 1970, that it had revoked the commitment because of unspecified failures of the corporate plaintiff to comply with the conditions.

As the Fourth Circuit pointed out in Haynes v. James H. Carr, Inc., 427 F. 2d 700 (4 Cir. 1970), cert. denied, 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (Dec. 7, 1970):

"Generally, the application of long arm statutes involves two steps. It is necessary to determine first whether the statute permits service of process on the nonresident defendant, and second, whether service under the statute violates the Due Process Clause of the federal constitution. * * *" 427 F.2d at 703.

This court is bound by authoritative interpretations of the Maryland long arm statute by the Court of Appeals of Maryland. Shealy v. Challenger Mfg. Co., 304 F.2d 102, 104 (4 Cir. 1962). On the constitutional issue, this court must follow decisions of the Supreme Court and, where the Supreme Court has not spoken, the Fourth Circuit.

In decisions construing the Maryland long arm statute, the Maryland Court has reiterated the following statements, first made as dictum in Gilliam v. Moog Industries, Inc., 239 Md. 107, 210 A.2d 390 (1965):

"It seems clear that the purpose of the Legislature in enacting these new provisions was to give the courts of the State personal jurisdiction over all out of state persons and corporations which constitutionally could be reached as having had sufficient Maryland contacts, under the jurisdictional yardstick established by the Supreme Court in cases such as International Shoe Co. v. State of Washington, 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95; McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed.2d 223; and Hanson v. Denckla, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283." 239 Md. at 111, 210 A.2d at 392.

See Novack v. National Hot Rod Ass'n, 247 Md. 350, 353–354, 231 A.2d 22 (1967); Vitro Electronics, etc., v. Milgray, 255 Md. 498, 504–505, 258 A.2d 749 (1969); Groom v. Margulies, 257 Md. 691, 700–701, 265 A.2d 249 (1970).

The Fourth Circuit noted in Beaty v. M. S. Steel Co., 401 F.2d 157, 160 (1968), cert. denied, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969), that the quoted statement is not strictly accurate with respect to subsection 96(a) (2); the same may be said of subsections 96(a) (3) and (4), dealing with tortious injury. However, there is no reason to question the accuracy of the statement of the Maryland Court of Appeals with respect to subsections 96(a) (1) and (b), which govern the instant case. This court must accept the conclusion that the Maryland Legislature intended to and did go to the full extent permitted by the Due Process Clause in enacting subsections 96(a) (1) and (b), quoted above.[3] So, in this case, the two questions specified by the Fourth Circuit in *Haynes* tend to merge and become essentially the same.

The leading case in the field is International Shoe Co. v. Washington, 326

---

3. If we consider the outer limits of jurisdiction permitted by the Due Process Clause as the circumference of a circle or the outer edge of a pie, and the six "enumerated acts" in § 96(a) (1)–(6) as six slices of the pie, it appears that some slices go all the way to the outer limit of the circle, while others stop short of the outer limit.

U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), where the Court sustained the exercise of jurisdiction because defendant had "certain minimal contacts" with the state of the forum, "such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice'." 326 U.S. at 316, 66 S. Ct. at 158.[4]

In McGee v. International Life Ins. Co., 355 U.S. 220, 78 S.Ct. 199, 2 L.Ed. 2d 223 (1957), the exercise of jurisdiction under a California statute which subjected foreign corporations to suit in California on insurance contracts with residents of that state was held constitutionally sound, though the only contacts of the defendant with persons in California had been by mail. The Court said: "It is sufficient for the purposes of due process that the suit was based on a contract which has substantial connection with that State." 355 U.S. at 223, 78 S.Ct. at 201. Later cases have noted that the decision in *McGee* was based upon a recognition of the special interest which a state has in contracts of insurance issued to its residents. See also Travelers Health Assn. v. Com. of Virginia, 339 U.S. 643, 648, 70 S.Ct. 924, 94 L.Ed. 1154 (1950).

In Hanson v. Denckla, 357 U.S. 235, 252, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958), after discussing the previous Supreme Court cases, the Court said:

"The unilateral activity of those who claim some relationship with a

nonresident defendant cannot satisfy the requirement of contact with the forum State. The application of that rule will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws. International Shoe Co. v. State of Washington, 326 U.S. 310, 319, 66 S.Ct. 154, 159, 90 L.Ed. 95." 357 U.S. at 253, 78 S.Ct. at 1239.

Those Supreme Court decisions have been discussed and applied by the Fourth Circuit in a number of cases, e. g., Erlanger Mills v. Cohoes Fibre Mills, 239 F.2d 502 (1956); Shealy v. Challenger Mfg. Co., supra; Beaty v. M. S. Steel Co., supra, and Golden Belt Manufacturing Co. v. Janler Plastic Mold Corp., 281 F.Supp. 368 (M.D.N.C.), aff'd 391 F.2d 266 (4 Cir. 1968). None of those cases is directly in point here, but they indicate that the Fourth Circuit has been cautious in applying long arm statutes.[5]

Plaintiffs rely on Southern Machine Co. v. Mohasco Industries, Inc., 401 F. 2d 374 (6 Cir. 1968), where the Court, after quoting from *McGee* and *Hanson*, said:

"From these two cases, three criteria emerge for determining the present outerlimits of in personam juris-

4. The Court also said:
"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those which do not, cannot be simply mechanical or quantitative. * * * Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. * * * " * * * to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that

privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." 326 U.S. at 319, 66 S.Ct. at 160.

5. Neither side cited any case dealing with loans. The only cases found dealing with loans are clearly distinguishable on the facts. 21 Turtle Creek Sq., Ltd. v. New York State Teach. Ret. Sys., 425 F.2d 1366 (5 Cir. 1970), and Kulm v. Idaho First Nat'l Bank, 428 F.2d 616 (8 Cir. 1970).

diction based on a single act. First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." 401 F.2d at 381.

The Sixth Circuit went on to hold that the place where the contract was made is not conclusive, that the physical presence of an agent is not necessary for the transaction of business in a state, and that the doing of an act or the causing of a consequence in the forum state by the defendant can satisfy the requirements of the "minimum contacts" test. The facts in that case, however, were quite different from the facts in our case. There, the defendant had entered into a licensing agreement which called for the manufacture of tufting machines at plaintiff's plant in Tennessee. Machines manufactured under the agreement were in fact sold or leased in Tennessee and defendant presumably obtained royalties from the buyer or lessee. The Court held that the agreement had a direct impact on commerce in Tennessee, that such impact was foreseeable at the time the agreement was executed and that the defendant had purposefully availed itself of the privilege of transacting business in Tennessee, satisfying the first of the criteria specified by the Sixth Circuit. The Court then considered the second question (whether the cause of action arose from the business transacted in the state), and the third question (whether the licensing agreement had a substantial enough connection with Tennessee to make it reasonable to compel the defendant to come to Tennessee to defend the suit), and held that the facts required an affirmative answer to both questions.

Other cases have stated the applicable constitutional tests in generally similar terms. Taylor v. Portland Paramount Corp., 383 F.2d 634 (9 Cir. 1967); Electro-Craft Corp. v. Maxwell Electronics Corp., 417 F.2d 365 (8 Cir. 1969).

In our case, plaintiffs rely on the following facts to support their argument that the applicable criteria are met: (1) that after the commitment had been made and accepted in New York, defendant, on three occasions, sent an inspector or representative to Maryland to report on the progress of the work; (2) that defendant had issued in New York a similar commitment in connection with another post office job in Maryland; and (3) that in reliance on the commitment (a) plaintiffs took various actions in Maryland, borrowing money, constructing the buildings, etc., as set out in the statement of facts, above, which substantially affected commerce in Maryland; (b) the Maryland bank loaned plaintiffs a very substantial sum of money secured by a mortgage on the Maryland property; and (c) most of these actions were contemplated by the original commitment agreement, as well as by the later tripartite agreement.

■ (1) Viewed in isolation, the sending of the inspectors into Maryland would not amount to minimum contacts sufficient to satisfy the constitutional tests. Moreover, the cause of action does not arise out of anything those inspectors did. See Haynes v. James H. Carr, Inc., supra, 427 F.2d at 704–705. Our case is strikingly different from *Hot Rod*, supra, 247 Md. 350, 231 A.2d 22, cited by plaintiffs. There the inspectors came to Maryland before the incident which caused the injury, and the defendant, for a fee, authorized the local promoter to advertise that the racing meet was sanctioned by defendant. In Harris v. Arlen Properties, Inc., 256 Md. 185, 260 A.2d 22 (1969), the activities of the defendant's agents in the state were even greater. So were the activities in Maryland of the defendant

in *Malinow v. Eberly*, decided this day by Judge Miller of this Court. 322 F. Supp. 594. In *Shealy*, supra, 304 F.2d 102, the defendant made monthly shipments into South Carolina, some in trucks owned and operated by the defendant.

■ (2) The other commitment, on a Baltimore post office, is a factor to be considered, but a very minor factor.

■ (3) (a) Again, the various actions taken by plaintiffs in Maryland in reliance upon the commitment amount to no more than "unilateral activity of those who claim some relationship with a non-resident defendant". Hanson v. Denckla, supra, 357 U.S. at 253, 78 S.Ct. at 1239. See also Erlanger Mills v. Cohoes Fibre Mills, supra; Golden Belt Mfg. Co. v. Janler Plastic Mold Corp., supra; Taylor v. Portland Paramount Corp., supra; Anderson v. Shiflett, 435 F.2d 1036 (10 Cir., 1971).

■ (3) (b) & (c) Those acts, however, must be considered in conjunction with the tripartite agreement between the defendant, the plaintiffs and the Maryland bank, pursuant to which the Maryland bank made a very substantial temporary loan to plaintiffs in Maryland, to permit plaintiffs to construct the buildings upon which defendant then desired to make a permanent loan. As such, the commitment letter can be said to have contemplated and to have had substantial consequences in Maryland and a substantial impact on commerce in Maryland. The first element in *Mohasco* and the corresponding elements in *Taylor* and *Electro-Craft* have, therefore, been met.

■ But the facts do not meet the second element of the *Mohasco* test and the corresponding element in the other opinions: the cause of action did not arise from or out of any business transacted in Maryland. There was no solicitation in Maryland; the agreement upon which plaintiffs sue was made in New York and was repudiated there; and the cause of action does not rest on what the inspectors did or did not do on their visits in Maryland. Subsection 96(b) of the Maryland long arm statute, which requires that the cause of action arise from one or more of the acts enumerated in § 96(a) was evidently enacted to assure that the exercise of jurisdiction under the statute would be kept within constitutional bounds.[6] Both the statute and the Due Process Clause require a ruling that this court has not acquired personal jurisdiction over the defendant herein. Haynes v. James H. Carr, Inc., supra; Kulm v. Idaho First Nat'l Bank, 428 F.2d 616 (8 Cir. 1970).

■ Accordingly, it is unnecessary to decide whether the acts of the defendant or consequences caused by the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction "reasonable". This action, however, will not be dismissed, but will be transferred to the Southern District of New York under 28 U.S.C. § 1406(a). Counsel should agree upon an appropriate order giving effect to this ruling.

6. The Maryland Legislature does not record any legislative history of its enactments, but the notes of the drafters of the Uniform Act state that this requirement, which was adopted verbatim in the Maryland Long-arm Statute, "is designed to prevent assertion of independent claims unrelated to any activity described * * *". Commissioners' Notes, § 103 Uniform Interstate and International Procedure Act, 9B U.L.A. (1966).