**UNITED MERCHANTS AND MANUFACTURERS, INC., and Pattern Rights, Inc.**

v.

**DAVID & DASH, INC., et al.**

**Civ. A. No. W–75–456.**

United States District Court, D. Maryland.

Oct. 3, 1977.

**8.** 380 U.S. at 428, 85 S.Ct. 1050, 1054.

Francis D. Murnaghan, Jr., Elizabeth H. Trimble and Venable, Baetjer & Howard, Baltimore, Md., for plaintiffs.

David L. Cohen and Arent, Fox, Kintner, Plotkin & Kahn, Washington, D. C., for defendant David & Dash, Inc.

WATKINS, Senior District Judge.

In this suit for infringement of a federal copyright and for unfair competition, Defendant David & Dash, Inc. (hereinafter D&D) has moved to dismiss the complaint or quash service of process for lack of *in personam* jurisdiction and for improper venue. Additionally, D&D has moved for dismissal of Count II (unfair competition) on the ground that plaintiffs' pursuit of that claim is barred by their failure to comply with state statutes regarding the qualification of foreign corporations to conduct intrastate business in Maryland.

Litigation of these matters has brought the Court and the parties, by a protracted route, to the point where plaintiffs have now concluded that further discovery relating to personal jurisdiction, although perhaps indicated by incompleteness in certain areas of the record, would be unduly expensive and time consuming. A hearing on these issues was held in December 1975, after which discovery continued, and numerous scholarly memoranda of law were filed with the Court. The Court agrees with the parties that no further hearing is necessary. Accordingly, pursuant to Local Rule 6, the issues will be decided on the basis of the present record.

I

*Personal Jurisdiction*

The existence of personal jurisdiction in this case depends upon the applicability of Maryland's long arm statute, Md.Ann.Code, Courts & Judicial Proceedings Article § 6–103, which in pertinent part provides:

§ 6–103. Cause of action arising from conduct in state or tortious injury outside state.

(a) *Condition.*—If jurisdiction over a person is based solely upon this section, he may be sued only on a cause of action arising from any act enumerated in this section.

(b) *In general.*—A court may exercise personal jurisdiction over a person, who directly or by an agent:

(1) Transacts any business or performs any character of work or service in the state;

(2) Contracts to supply goods, food, services, or manufactured products in the state;

(3) Causes tortious injury in the state by an act or omission in the state;

(4) Causes tortious injury in the state or outside of the state by an act or omission outside the state if he regularly does or solicits business, engages in any other persistent course of conduct in the state or derives substantial revenue from goods, food, services, or manufactured products used or consumed in the state . . . .

■ Applicability of the long arm statute depends upon a two-step analysis. *Haynes v. James H. Carr, Inc.*, 427 F.2d 700, 703 (4 Cir.), *cert. denied*, 400 U.S. 942, 91 S.Ct. 238, 27 L.Ed.2d 245 (1970). First, it is necessary to determine whether the facts fit within the statutory language. In this regard, authoritative interpretations of the statute by the Court of Appeals of Maryland are controlling. *See Shealy v. Challenger Mfg. Co.*, 304 F.2d 102, 104 (4 Cir. 1962). Second, the Court must determine whether the exercise of personal jurisdiction would be consonant with due process. As Judge Thomsen noted in *Piracci v. New York City Employees' Retirement System*, 321 F.Supp. 1067, 1070 (D.Md.1971), the two questions often tend to merge, inasmuch as the Maryland legislature intended "to expand the boundaries of permissible *in personam* jurisdiction to the limits permitted by the Federal Constitution." *Geelhoed v. Jensen*, 277 Md. 220, 224, 352 A.2d 818, 821

(1976); *Krashes v. White*, 275 Md. 549, 558–59, 341 A.2d 798 (1975); *Lamprecht v. Piper Aircraft Corp.*, 262 Md. 126, 130, 277 A.2d 272 (1971), and *Harris v. Arlen Properties, Inc.*, 256 Md. 185, 195–96, 260 A.2d 22 (1969). Regarding issues of due process, however, federal law is controlling. *Piracci, supra.*

■ The burden of alleging and proving the existence of a factual basis for the exercise of *in personam* jurisdiction, once it has been placed in controversy, rests with plaintiffs. *See McNutt v. General Motors Acceptance Corp.*, 298 U.S. 178, 189, 56 S.Ct. 780, 80 L.Ed. 1135 (1936). In the instant case, the Court deems the following facts sufficiently proven for purposes of this motion.

Plaintiff United Merchants and Manufacturers, Inc. (hereinafter UM&M), through its various divisions, is a converter of textiles; that is, it dyes and finishes raw fabrics, imprints them with color and design, and sells the finished textiles to manufacturers of draperies, upholsterers, and apparel manufacturers. The original designs used in converting the textiles are copyrighted in the name of Pattern Rights, Inc., a wholly-owned subsidiary of UM&M.

In 1969, UM&M introduced a fabric pattern called "Magnolia" through its Riverdale Division. This apparently attractive design features large white flowers on a colored background with the centers of the flowers being of a contrasting color. The design was registered with the Register of Copyrights, and all "Magnolia" fabric bears a copyright notice on its selvedge edge.

"Magnolia" received favorable comment in the trade and was selected for use as drapery and bedspread fabric in at least three prominent new hotels, including the Sheraton-Fontainebleau Hotel in Ocean City, Maryland. In 1972, representatives of Defendant Savoir Faire, Inc., design consultants for the Sheraton-Fontainebleau, visited the Riverdale showroom and were provided with samples, or "strikeoffs," of "Magnolia" fabric. Each strikeoff bore notice of copyright and a statement that the

strikeoffs were accepted on the express understanding and agreement that the pattern would not be copied. Savoir Faire subsequently placed an order with Riverdale for approximately $30,000 worth of drapery fabric and bedspreads, mostly in the "Magnolia" design, to be used in the hotel. In early 1973, however, a problem arose when UM§M's credit department refused to bill Savoir Faire directly and insisted that financial guarantees be provided. Shortly thereafter, Savoir Faire cancelled its order with Riverdale.

For purposes of this motion, it appears that Savoir Faire then took the "Magnolia" strikeoffs to D&D and placed an order for "Magnolia" fabric in the same amounts originally ordered from Riverdale. It was agreed that D&D would furnish the drapery material to Savoir Faire's drapery fabricator in Hyattsville, Maryland, and that the finished bedspreads would be sent directly to the hotel. According to the purchase orders and invoices, all goods were to be shipped prior to complete payment, f. o. b. destination; title was to remain in D&D until full payment was received. Supplemental orders for fabric and bedspreads were placed over the next several months, and the ordered merchandise was in fact shipped into Maryland. Plaintiffs allege that the D&D fabric, originally called "Magnolia" but later renamed "Amapola,"[1] was an infringing copy of their copyrighted design. In all, nearly 12,000 yards of "Amapola" were sold to Savoir Faire. *Affidavit* of Jay Dash.

Throughout the course of dealing between Savoir Faire and D&D, no D&D representative, agent, or officer entered the State of Maryland in connection with this transaction, although there was some mutual contact by mail and telephone. D&D, a Florida corporation based in Miami, does not maintain a company representative in Maryland but clearly does transact business with Maryland firms.[2] Over the past several years, D&D has maintained a merchandising relationship with Rian Taggert Associates, an independent firm located in Bethesda, Maryland. *See Affidavit* of Jay Dash. Rian Taggert displays the goods of D&D and other manufacturers in its showrooms, takes orders, and forwards the orders to D&D for acceptance. For this service, Rian Taggert receives a commission. It appears, however, that Rian Taggert was not involved in the marketing of "Amapola." The record also shows that D&D and Savoir Faire had transacted business in the past and suggests that those prior dealings were more substantial than the transaction alleged in the instant case.[3]

Plaintiffs contend that all of the quoted subsections of § 6–103 apply to these facts. It is sufficient, however, if any one subsection applies. *Lawson v. Baltimore Paint & Chemical Corp.,* 298 F.Supp. 373, 377 (D.Md.1969); *see, e. g., Holfield v. Power Chemical Co.,* 382 F.Supp. 388, 392 (D.Md.1974).

It is plain that subsections (b)(2) and (b)(3) have no application, because the literal terms of the statute are not met by these facts. Subsection (b)(2) expressly applies only to actions arising out of a contract. *See McLaughlin v. Copeland,* 435 F.Supp. 513 (D.Md.1977). This case, although related to a contract, is in every particular a tort action and therefore outside the scope of (b)(2). *Holfield, supra,* on which plaintiffs rely, is not contrary. There the court found jurisdiction pursuant to (b)(2) where plaintiff alleged misrepresentation; *Holfield* was, however, an action for rescission of a contract, and the claim

---

1. Spanish meaning "poppy."

2. The extent of these dealings is not clear from the record. Plaintiffs were afforded an opportunity to examine D&D's business records in Miami but elected not to do so.

3. In a letter to Savoir Faire, D&D vice president, Jay Dash, states that, with respect to Savoir Faire, D&D has functioned "both as a primary source [and] also as a 'safety valve' when others could not perform to your [Savoir Faire's] expectations." Ashman Dep. Exh. No. 7. In the context of this transaction, the term "safety valve" refers to the urgent situation brought on by the collapse of the Riverdale transaction so near the proposed opening date of the hotel.

arose from the contractual relationship between the parties. Subsection (b)(3) also has no application to the instant case; there is no proof that the defendant committed an act or omission *in the state* which has caused tortious injury. Whatever such acts may have been committed took place in Florida, and those do not fall within the ambit of (b)(3).

The possible applicability of (b)(1) is a much closer question. In this regard, D&D has pursued two arguments. D&D contends, first, that (b)(1) applies only to actions in contract; and, second, that it has not engaged in any transaction of business in Maryland related to the claim.

Until recently, the only authoritative decisions on the first of these arguments favored the defendant. *See Zinz v. Evans & Mitchell Indus.*, 22 Md.App. 126, 324 A.2d 140 (1974) and *Hedwin Corp. v. Bright of America, Inc.*, Civil No. HM–76–849, slip op. at 3 (D.Md. Jan. 24, 1977). As noted in *Zinz, quoting* Auerbach, *The "Long Arm" Comes to Maryland*, 26 Md.L.Rev. 13, 34 n. 124 (1966), the term "transacting business" is technically broad enough to encompass tort as well as contract actions. Nevertheless, the court in *Zinz* reasoned that the presence of specific provisions dealing with tort actions obviated the need for such a broad construction. The court, therefore, construed (b)(1) as applicable only to contract actions. *Zinz, supra*, 22 Md.App. at 130, 324 A.2d 140.

In *Mohamed v. Michael*, 279 Md. 653, 370 A.2d 551 (1977), however, without discussing *Zinz* or the arguments made therein, the Court of Appeals of Maryland rested personal jurisdiction in a tort action solely upon subsection (b)(1). There the plaintiff claimed defamation, abuse of process, malicious prosecution, and false imprisonment alleged to have arisen in the context of attempts by the defendant and his agents to secure payment on a note. It was alleged that some of the "negotiations" in Maryland had included threats of prosecution. Reversing a dismissal of the case by the trial court, the Court of Appeals held that the activities of the defendant's agents in Maryland, *viz.*, the "negotiations," constituted a transaction of business within subsection (b)(1). In so holding, the court emphasized "the intent of the Legislature in enacting the long arm statute to expand the personal jurisdiction of the courts to the extent permitted by the Fourteenth Amendment." *Id.* at 657, 370 A.2d at 553.

The holding in *Mohamed* is entirely incompatible with the position announced in *Zinz*. *Accord, McLaughlin, supra*, 435 F.Supp. at 523 n.2. Under *Mohamed*, which this Court must regard as binding, the proper focus of inquiry is to determine whether or not the disputed activities of the defendant may constitutionally be regarded as "transacting business in the state," without regard for the technical basis of the action in contract or otherwise. Defendant's first argument thus fails.

Nevertheless, the Court is reluctant to rest jurisdiction in this case upon (b)(1), because it is questionable whether the defendant's activities in the disputed transaction, to the extent that those activities were related to Maryland, may be termed transacting business "in the state." There has been no physical presence in Maryland by any D&D employee or agent, nor is there any clear history of past transactions. All that appears is the shipment of goods into the state accompanied by billing and some incidental communications by mail and telephone. D&D argues that these limited contacts do not amount to the transaction of business in Maryland, and there is significant support for this position. *See Ajax Realty Corp. v. J. F. Zook, Inc.*, 493 F.2d 818, 821 n. 4 (4 Cir. 1972); *Erlanger Mills v. Cohoes Fibre Mills*, 239 F.2d 502 (4 Cir. 1956); *Beaty v. M. S. Steel Co.*, 276 F.Supp. 259 (D.Md.1967), *aff'd* 401 F.2d 157 (4 Cir. 1968), *cert. denied*, 393 U.S. 1049, 89 S.Ct. 686, 21 L.Ed.2d 691 (1969).

In this instance, it is not necessary to decide that question, because the Court is satisfied that personal jurisdiction may properly be based on subjection (b)(4). The copying of the protected design, proven for purposes of this motion, constituted an act causing tortious injury. Therefore, jur-

isdiction may be exercised under (b)(4) if D&D

> regularly does or solicits business, engages in any other persistent course of conduct in the state, or derives substantial revenue from goods . . . or manufactured products used or consumed in the state.

These additional contacts with the state need not be related to the claim; they are required by the statute as an additional safeguard against any imposition of jurisdiction violative of due process. *See Geelhoed, supra,* 277 Md. at 231, 352 A.2d 818.

> Due process, in this context, requires that in order to subject a defendant to a judgment *in personam,* if he be not present within the territory of the forum, he have certain minimum contacts with it such that the maintenance of the suit does not offend "traditional notions of fair play and substantial justice."

*International Shoe Co. v. Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 158, 90 L.Ed. 95 (1945). Within this broad guideline, the rule as to exercise of personal jurisdiction

> will vary with the quality and nature of the defendant's activity, but it is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

*Hanson v. Denckla,* 357 U.S. 235, 253, 78 S.Ct. 1228, 1240, 2 L.Ed.2d 1283 (1958). Moreover,

> [i]f "plaintiff's injury does not arise out of something done in the forum state, then other contacts between the corporation and the state must be *fairly extensive* before the burden of defending a suit there may be imposed upon it without offending 'traditional notions of fair play and substantial justice.' "

*Ratliff v. Cooper Laboratories, Inc.,* 444 F.2d 745, 748 (4 Cir. 1971) (emphasis in original).

██ In the case at bar, the claim arises out of acts done outside the State of Maryland. Nevertheless, due process is satisfied if the statutory terms are met and the contacts falling within those terms are "fairly extensive." The facts of this case amply disclose contacts with Maryland which satisfy the terms of (b)(4) and justify the exercise of jurisdiction consistent with due process.

First, D&D has "derived substantial revenue" from "goods or manufactured items used in the state." This much was admitted by then counsel for D&D at the December 1975 hearing on the instant motion, as evidenced by the following colloquy:

> MR. COHEN: For these reasons, Your Honor, we would submit that there was no transaction of business by David & Dash. . . . All it did was to send the goods into Maryland, make telephone calls and write an occasional letter.
>
> THE COURT: For a fairly substantial consideration.
>
> MR. COHEN: For a fairly substantial—
>
> THE COURT: To derive substantial revenue.
>
> MR. COHEN: I wouldn't deny that, Your Honor, for a substantial revenue, but that is true in many, if not all, of the cases in which a defendant sends goods into another state in any single transaction. It may very well be that there will be a substantial revenue earned by the transaction.

Tape of Proceedings, December 12, 1975.

Apart from that concession, this Court would still find that the proceeds of this transaction were substantial both in terms of gross amount and as a percentage of overall sales. The sale of "Amapola" for use in the Sheraton-Fontainebleau realized more than $30,000, representing nearly ½ of 1 percent of D&D's total 1975 sales. *See* Answer to Interrogatory No. 2. The dollar value of the sales, of course, is not to be viewed in the abstract; but, in the light of all circumstances, the Court views it as substantial. Indeed, much smaller sums have been regarded as "substantial." *See, e. g., Johnson v. Equitable Life Assurance Society,* 22 A.D.2d 138, 140, 254 N.Y.S.2d

258, 260 (N.Y. 1st Dep. 1964) (dictum, $1,798.20 a substantial sum); *Mark v. Obear & Sons, Inc.*, 313 F.Supp. 373, 375–76 (D.Mass.1970) ($5,000 a substantial sum). The percentage of gross sales represented by these proceeds, while not dispositive, is a significant factor in this assessment. *Cf. Ajax Realty Corp., supra*, 493 F.2d at 821–22. Here the percentage of sales and the gross amount of sales are comparable to those found in *Ajax* to be "substantial" for purposes of a provision similar to (b)(4) ($37,000 in gross sales representing less than ½ of 1 percent of gross sales).

Furthermore, it is apparent from the long-standing relationship between D&D and Rian Taggert that D&D "regularly solicits business" in Maryland. It is not particularly significant that D&D and Rian Taggert are separate business entities. "Where a defendant allows its products to be marketed in a state, the state certainly has a right to give its citizens jurisdiction over the offending corporation in the state of injury." *Johnson v. Helicopter & Airplane Services Corp.*, 389 F.Supp. 509, 521 (D.Md.1975).

In sum, under the circumstances presented, D&D "purposefully availed itself of the forum" both in its dealing with Rian Taggert and, more importantly, in the specific transaction at issue. Unlike the merchandise at issue in *Ajax*, the "Amapola" drapery fabric and bedspreads were created and manufactured specifically for shipment into Maryland with full knowledge that they would be used in Maryland. D&D's contacts with Maryland apart from the alleged copying, which occurred (if at all) outside the state, have been extensive. *Ratliff, supra*. Thus, both the literal terms of (b)(4) and "traditional notions of fair play and substantial justice" have been satisfied. It is also significant, although not dispositive, that Maryland is a convenient forum for many of the parties—no less so than Florida—and that the transaction at issue was

intimately involved with this state, for it is here that the offending fabric is on public display, and in all likelihood it is here that the alleged loss of business and good will would have occurred. The Court, therefore, holds that personal jurisdiction may be found under § 6–103(b)(4).

## II

### Venue

At the December 1975 hearing, counsel for D&D conceded that the existence of proper venue would not be contested in the event the Court were to find proper the exercise of personal jurisdiction. It is, in any event, accepted that a defendant in a copyright action may be "found" for purposes of venue, *cf.* 28 U.S.C. § 1400(a), wherever it may constitutionally be served with process. *See Droke House Publishers, Inc. v. Aladdin Distributing Corp.*, 352 F.Supp. 1062, 1063–64 (N.D.Ga. 1972); *Boltons Trading Corp. v. Killiam*, 320 F.Supp. 1182, 1183 (S.D.N.Y.1970), and *Hill & Range Songs, Inc. v. Fred Rose Music, Inc.*, 58 F.R.D. 185, 189 (S.D.N.Y.1972). Accordingly, the Court finds that venue is proper in this District.

## III

### Motion to Dismiss Count II

The remaining controversy concerns UM&M's ability to maintain Count II, a pendent claim of unfair competition brought pursuant to 28 U.S.C. § 1338(b). The defendant contends that UM&M, a foreign corporation,[4] has conducted intrastate business in Maryland without "qualifying" to do so as required by state law. The penalty for such a transgression as prescribed by Maryland statute, is denial of access to the state's courts, and D&D argues that such a bar should be imposed in the instant case with respect to Count II.[5]

---

4. UM&M is a Delaware corporation whose principal place of business appears to be New York, but is not claimed or alleged to be Maryland.

5. There is no contention that any state statute should, or could, prevent assertion of a substantive claim brought under the Copyright Act. Plainly, it could not. *See, e. g., Holmberg v. Armbrecht*, 327 U.S. 392, 66 S.Ct. 582, 90

Md.Ann.Code, Corporations & Associations Article § 7–203, provides that any foreign corporation must "qualify with the State Department of Assessments and Taxation before doing intrastate business in Maryland.[6] If this requirement is not met, "neither the corporation nor any person claiming under it may maintain a suit in any court of this State" unless it first qualifies, pays a penalty, or ceases doing intrastate business here.

Relying principally on *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and *Guaranty Trust Co. v. York*, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945), the Supreme Court has held that federal courts must apply "door closing" statutes such as § 7–301 in diversity cases. *Woods v. Interstate Realty Co.*, 337 U.S. 535, 538, 69 S.Ct. 1235, 93 L.Ed. 1524 (1949). *Woods* is not directly applicable to the instant case because jurisdiction as to Count II is predicated on 28 U.S.C. § 1338(b) rather than 28 U.S.C. § 1332 (diversity of citizenship and amount in controversy exceeding $10,000); however, defendant argues that the unfair competition count is essentially a substantive state claim, and that the reasoning of *Woods* (and of *Erie* and *York*) should thus apply.

This argument has been made in only two reported cases of which this court is aware, those being *Lyon v. Quality Courts United, Inc.*, 249 F.2d 790 (6 Cir. 1957) and *Harms, Inc. v. Tops Music Enterprises, Inc., of Cal.*, 160 F.Supp. 77 (S.D.Cal.1958). In *Lyon*, the court held that the Ohio "door closing" statute was ineffective to bar plaintiff from asserting a claim of unfair competition that had been pendented to a federal trademark claim on the ground that the unfair competition claim (brought pursuant to § 1338(b)) arose from a "federal substantive right created by Congress" and thus could not be abrogated by operation of a state statute. *Lyon, supra,* 249 F.2d at 794–96.[7] In *Harms,* the court perfunctorily brushed aside the "minor contention" of the defendant that the plaintiff might be precluded from maintaining an unfair competition claim because of an alleged failure to qualify to do business in California, the forum state, stating that the plaintiff's "right to sue" was federal. *See Harms, supra,* 160 F.Supp. at 80–81. Neither case, however, presented any clear explication of where this "federal substantive right" was to be found or of what its contours might be with reference to the language of § 1338(b), which facially appears only to confer jurisdiction, i. e., *power to adjudicate* pendent unfair competition claims.[8]

The question is further complicated by the varying solutions adopted for choice of law problems relating to pendent claims of unfair competition. Several courts have taken the position that state law should govern because the *source* of such an action for unfair competition is *state law. See, e. g., Coca-Cola Co. v. Cahill,* 350 F.Supp. 1231, 1233 (W.D.Okl.1972), *aff'd,* 480 F.2d 153 (10 Cir. 1973); *Surgical Supply Serv., Inc. v. Adler,* 321 F.2d 536, 537 (3 Cir. 1963); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.,* 234 F.2d 538, 540–41 n.1 (2 Cir. 1956); *contra, Bliss v. Gotham Indus., Inc.,*

L.Ed. 743 (1946) (state statute of limitations ineffective to bar enforcement of a federally created equitable right under the Federal Farm Loan Act).

6. In order to qualify to do business in Maryland, the foreign corporation must, *inter alia,* certify to its address, its standing in the state of organization, and the name and address of its resident agent.

7. *See* Note 5, *supra.*

8. The opinion in *Harms* cited only § 1338(b) and 15 U.S.C. § 1121 in support of its contention that there was a "federal right to sue." Yet neither statute suggests the existence of any substantive basis in federal law for an action in unfair competition. Both statutes are facially no more than grants of jurisdiction. The decision in *Harms* is further clouded by the mysterious reliance of the trial court on a nonexistent footnote allegedly a part of *Woods. See Harms, supra,* 160 F.Supp. at 81 n. 11.

Lyon, unlike *Harms,* cites no statute in support of the statement that there is a congressional grant of substantive right. Clearly, there was no reliance on the possible existence of a cause of action for unfair competition under the Lanham Act itself. *Lyon, supra,* 249 F.2d at 796.

316 F.2d 848, 854 (9 Cir. 1963) (absent diversity, federal law governs pendent unfair competition claims). If, as stated in *Maternally Yours*, § 1338(b) does no more than codify the theory of pendent jurisdiction adopted in *Hurn v. Oursler*, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933), and if state substantive law governs the pendent claim even absent diversity, *Coca-Cola* and *Surgical Supply, supra,* then it can be argued with some force that the state door closing statute should also apply, just as it was held applicable to a diversity case in *Woods.*

This issue is not squarely presented in the case at bar, however, because there is virtually no evidence that UM&M has been "doing intrastate business" in Maryland. Absent such proof, UM&M is not subject to the requirements of Md.Ann.Code, Courts & Judicial Proceedings Article § 7–203 or the sanctions of Md.Ann.Code, Courts & Judicial Proceedings Article § 7–301, even if it is assumed *arguendo* that defendant is correct in contending, as a matter of law, that § 7–301 can operate as a bar to the maintenance of a pendent claim brought pursuant to 28 U.S.C. § 1338(b). In this matter, the burden of proof rests with the defendant. *See Rudden v. Gro-Plant Indus., Inc.,* 269 Md. 173, 176, 304 A.2d 812 (1973).

In order to assess whether or not UM&M has conducted intrastate business in Maryland, it is necessary to examine the "nature and extent of the business and activities" pursued in Maryland. *Chesapeake Supply & Equip. Co. v. Manitowoc Eng'r Corp.,* 232 Md. 555, 562, 194 A.2d 624, 628 (1963). For § 7–203 to apply, it must be shown that the corporation engaged in some activity of a purely intrastate character; no amount of purely *interstate* activity, can constitute *intrastate* commerce. *See, e. g., Premier Indus. Corp. v. Nechamkin,* 403 F.Supp. 180 (D.Md.1975) (where plaintiff had engaged in very substantial activities in Maryland, but all such activities were of an interstate character, the foreign corporation had not done intrastate business and was not required to qualify to do such business).[9] In this regard it is recognized that the mere solicitation of interstate sales by agents or employees who lack authority to bind the corporation, even though the salesmen operate in Maryland, does not amount to "doing intrastate business." *G.E.M., Inc. v. Plough, Inc.,* 228 Md. 484, 488, 180 A.2d 478 (1962); *Feldman v. Thew Shovel Co.,* 214 Md. 387, 135 A.2d 428 (1957). *See also Premier Indus. Corp., supra,* 403 F.Supp. at 183, and *Champion Spark Plug Co. v. T. G. Stores, Inc.,* 239

**9.** With respect to statutes such as § 7–203, the term "intrastate" does not apply to transactions which involve no more than the passage of articles in a stream of interstate commerce. *See Allenberg Cotton Co. v. Pittman,* 419 U.S. 20, 32–33, 95 S.Ct. 260, 42 L.Ed.2d 195 (1974). However, highly localized business, such as transactions between wholesalers and retailers inside the state, or transactions between retailers and consumers, may be regarded as intrastate commerce in this context even though the subject matter of the particular transaction passes, at some point, in interstate commerce. Thus, in *Allenberg,* the activities of a Tennessee cotton merchant who arranged for the purchase of cotton from a Mississippi farmer were held to be interstate commerce even though the cotton in transit to Tennessee was delivered to a Mississippi middleman and even though title passed to the middleman; while in *Eli Lilly & Co. v. Sav-On Drugs, Inc.,* 366 U.S. 276, 81 S.Ct. 1316, 6 L.Ed.2d 288 (1961), a case expressly distinguished in *Allenberg,* a state statute analogous to § 7–203 was held applicable to a corporation whose salesmen, in addition to soliciting interstate sales of pharmaceuticals to drug wholesalers, also promoted and participated actively in sales by the wholesalers to medical users such as hospitals and physicians. The Supreme Court agreed with the conclusion of the New Jersey court that it was unrealistic to view these activities as anything but domestic business in the circumstances of the case. 366 U.S. at 280, 81 S.Ct. 1316. Maryland has yet to extend its reach under § 7–203 as far as *Eli Lilly* has indicated may be permissible, and Maryland decisions have instead treated the promotion of "intrastate" sales, on the facts presented therein, as merely incidental and a part of the solicitation of interstate sales. *See Gilliam v. Moog Indus., Inc.,* 239 Md. 107, 109, 210 A.2d 390 (1965); and *Champion Spark Plug, supra,* 239 F.Supp. at 946. Nevertheless, it is clear from *Eli Lilly* that the mere fact that a product has at some time moved in interstate commerce does not necessarily clothe all subsequent transactions involving that product with the protective mantle of "interstate commerce."

F.Supp. 941, 946 (D.Md.1965), *aff'd*, 356 F.2d 462 (4 Cir. 1966).

Furthermore, participation in "local" transactions, such as those between the in-state distributor and an in-state consumer, does not amount to "doing business" in Maryland so long as these activities are "incidental to, and directly connected with," the solicitation of interstate sales. *G.E.M., Inc. v. Plough, Inc., supra* (manager of foreign corporation occasionally enters the state to discuss a discount with a customer; sales representatives occasionally distribute promotional materials to customers or make discount allowances); *see Gilliam v. Moog Indus., Inc.*, 239 Md. 107, 108, 210 A.2d 390 (1965) (district manager of foreign corporation made calls on wholesale customers and on customers of the wholesalers to promote sales, and conducted "clinics" for installers of the product to promote sales); *Champion Spark Plug, supra*, and *Premier Indus. Corp., supra.*

Courts have, however, found that the foreign corporation has done business in Maryland if it has engaged in substantial in-state activity *unrelated* to the solicitation of interstate sales. *See Thomas v. Hudson Sales Corp.*, 204 Md. 450, 105 A.2d 225 (1954); *White v. Caterpillar Tractor Co.*, 235 Md. 368, 201 A.2d 856 (1964) (corporation maintains extensive control over activities of the in-state distributor in the area of sales and service far beyond the scope of mere solicitation of orders); *Becker v. General Motors Corp.*, 167 F.Supp. 164, 167 (D.Md.1958) (foreign corporation maintains substantial inventory in the state, and its salaried employee and its "custodian" carry on continuous activities therein in its behalf); *William Barnes Hall, Inc. v. Flintkote Co.*, 139 F.Supp. 32 (D.Md.1956) (representative of foreign corporation "serviced" local customer, visiting jobsites to be sure asbestos siding was being installed properly and making inspections of roofs which were to be covered by a company guarantee).

Turning to the facts of the instant case, it is clear that UM&M's activities in Maryland do not even approach the substantial involvement in intrastate transactions held *not* to constitute "doing business" in *Gilliam* and *Champion Spark Plug.* On the contrary, they reveal a pattern of transactions that can only be described as "mere solicitation" for purposes of this case.

UM&M's transactions with Maryland customers, with one exception, have been confined to the sale of goods shipped into Maryland from outside the state. Orders for these sales are procured by UM&M directly and by two sales representatives who service UM&M accounts in Maryland and in several other states. The only duty of these salesmen, as evidenced by their written employment contracts filed with the Court, is the solicitation of interstate sales orders.[10] Although the record is silent as to one salesman, it is uncontroverted that the other has never participated in "intrastate" transactions involving wholesalers or jobbers and their customers, and has never engaged in activities within the state to aid customers in the installation or use of products. All orders are sent to New York for acceptance or rejection by UM&M, which retains "the unqualified right to reject any order tendered" by the sales representatives. Contracts of Employment, ¶ Third F. UM&M has never advertised in Maryland, maintains no showroom or display here, and has never warehoused or maintained an inventory of goods in Maryland. It does, however, lease a business office in Pikesville for the use of one of the sales representatives, with the names of its Ameritex and Cohama divisions on the office door. It has also listed the telephone number of its Cohn-Hall-Marx division (at the Pikesville location) in the Baltimore telephone directory.

Defendant has argued that by maintaining an office and a business telephone listing in Maryland, UM&M has "established for itself an outpost for its Maryland operations, and created in the state an extension of its corporate presence." Supplemental Memorandum of D&D in Support of Motion

---

**10.** In the sales representatives' employment contracts, UM&M reserved the right to assign other unspecified duties, but there is no evidence that it has ever done so.

to Dismiss Count II, at 7. D&D also asserts that UM&M has "used the Maryland office not only to assist in soliciting interstate sales to Maryland, but as its headquarters for [one salesman's] activity throughout his territory." *Id.*

■ With respect to the first argument, it is true that the foreign corporations held not to be "doing business" in the reported cases have not had Maryland offices or telephone listings. The mere existence of the office or telephone, however, is not dispositive and, indeed, may not even be significant in a given case for purposes of § 7–203; what matters is the *intrastate or interstate character of the transactions engaged in* by the foreign corporation. The maintenance of an office and business telephone is as consistent with the pursuit of purely interstate business as it is with "doing business" in the state. Likewise, an "extension of . . . corporate presence" is consistent with either intrastate or interstate business. Here the Court is not dealing with a question of personal jurisdiction, a matter in which "corporate presence" has particular significance. Instead, it must consider whether the evidence reveals the carrying on of *intrastate* business in Maryland, and "corporate presence," in itself, does not suggest such activity.

As to the second assertion made by D&D, UM&M's involvement in the activities of its salesmen *elsewhere* in their territories, i. e., outside Maryland, is irrelevant.

■ D&D also relies on two other instances in which UM&M has business contact with Maryland. First, UM&M's wholly-owned subsidiary, Robert Hall, Inc., maintains a chain of retail clothing stores in Maryland. Second, UM&M's financial division owns a perfected security interest in certain unspecified personal property in Maryland and allegedly has made loans to customers *outside* Maryland secured by accounts receivable possibly relating to goods *inside* Maryland.

Neither of these contacts amounts to "doing intrastate business" in Maryland. Robert Hall, Inc., is a Maryland corporation; as such it need not qualify to do business here. Nor is there any evidence to suggest that UM&M has exercised control over Robert Hall sufficient to require that the activities of the subsidiary be attributed to the parent by "piercing the veil." Further, the transactions of UM&M's financial division appear to have been interstate in nature. To the extent that they may not have been, there is nothing to show that the ownership of a *single* security interest on Maryland personal property in this case is anything other than an isolated transaction; such transactions have been excluded by statute from the definition of "intrastate commerce." *See* § 7–103(7). It is doubtful, in any event, that the mere ownership of an interest of this kind could constitute "doing business." Under § 7–104, for example, both the ownership of real property obtained by foreclosure of a mortgage or deed of trust and the foreclosure proceeding itself are excluded from the definition of "intrastate commerce."

The Court concludes that there is no factual basis for D&D's contention that UM&M has done intrastate business in Maryland. The motion to dismiss Count II will therefore be denied. Accordingly, it is this 3rd day of October, 1977, by the United States District Court for the District of Maryland, ORDERED:

1. That defendant's motion to quash service of process and to dismiss BE, and the same IS, in all respects DENIED; and

2. That the Clerk of the Court send copies of this opinion and order to counsel for all parties.