BARILE, APPELLANT, *v.*
UNIVERSITY OF VIRGINIA, APPELLEE.

(No. 42729—Decided August 27, 1981.)

*Messrs. Mancino, Mancino & Mancino* and *Mr. Paul Mancino, Jr.,* for appellant.

*Mr. Frank J. Soldat,* for appellee.

JACKSON, C.J. This action for breach of contract was initiated by appellant, Carl Barile, in the Cuyahoga County Court of Common Pleas against the appellee, University of Virginia, the college he attended as an undergraduate. In the lower court, the appellee moved to dismiss appellant's complaint pursuant to Civ. R. 12(B)(2) on the ground that it was not subject to the personal jurisdiction of the Ohio courts. The trial court granted the motion to dismiss. Appellant appeals the decision of the trial court and assigns two errors for review.

For his first assignment of error,[1] appellant contends that Ohio courts are entitled to exercise personal jurisdiction over appellee with respect to the issue at bar, and that the trial court erred in granting appellee's motion to dismiss.

Civ. R. 4.3(A) and R.C. 2307.382 authorize out-of-state service of process upon a non-resident defendant who transacts any business in Ohio when the cause of action asserted arises out of such transaction. R.C. 2307.382 provides, in part:

"(A) A court may exercise personal jurisdiction over a person who acts directly or by an agent, as to a cause of action arising from the person's:

"(1) Transacting any business in this state;

"* * *

"(B) When jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted against him."

In ruling on a motion to dismiss for lack of jurisdiction over the person of the defendant, a trial court may, in an appropriate case, determine the jurisdictional issue from the pleadings and documentary evidence submitted by the

---

[1] Appellant's first assignment of error provides:

"The court committed prejudicial error in determining that the defendant was not amenable to service of process within the state of Ohio and therefore the common pleas court did not have jurisdiction over the person of the defendant."

parties in support and in opposition to the motion. *Jurko* v. *Jobs Europe Agency* (1975), 43 Ohio App. 2d 79 [72 O.O.2d 287].

While the mere allegations of the complaint, when contradicted by opposing affidavits, are not of sufficient evidentiary quality to sustain an assertion of *in personam* jurisdiction, *Taylor* v. *Portland Paramount Corp.* (C.A. 9, 1967), 383 F. 2d 634, 639, and *Uston* v. *Grand Resorts, Inc.* (C.A. 9, 1977), 564 F.2d 1217, 1218, the factual allegations of the complaint, when uncontradicted by opposing affidavits, must be taken as true. *Black* v. *Acme Markets, Inc.* (C.A. 5, 1977), 564 F. 2d 681.

If the trial court determines the motion to dismiss without the benefit of an evidentiary hearing, the trial court must view the factual allegations of the pleadings and documentary evidence in a light most favorable to the non-moving party, and resolve all reasonable competing inferences in favor of such non-moving party. *Jurko* v. *Jobs Europe Agency, supra.* Cf. *Woodworkers Tool Works* v. *Byrne* (C.A. 9, 1951), 191 F. 2d 667, at 673. Where the operative facts asserted by a non-moving party demonstrate a *prima facie* showing of personal jurisdiction, the motion to dismiss should

be overruled.[2] *Jurko* v. *Jobs Europe Agency, supra.*

Construing the complaint and the affidavits[3] filed in support and in opposition to appellee's motion to dismiss in a light most favorable to appellant, the following undisputed facts have been ascertained:

Appellee, University of Virginia, a non-stock corporation, is a duly licensed and accredited university in Charlottesville, Virginia, and is a member of the Atlantic Coast Conference (ACC) of the National Collegiate Athletic Association (NCAA). Appellee has no offices, classrooms, phones, employees, or "resident representatives" in the state of Ohio. On April 8, 1971, while attending high school, appellant was approached at his East Cleveland, Ohio, residence by Mr. Peter R. Pucher, a member of appellee's athletic department. Mr. Pucher solicited appellant to play football for and to attend college at the University of Virginia, and urged appellant to apply for financial aid. Both appellant and his father, Jack R. Barile, signed an application for a scholarship at the University of Virginia.

On May 5, 1971, an agent of the appellee again visited the East Cleveland, Ohio, residence of the appellant to recruit him to play football at the University of Virginia.

---

[2] If, upon the record, the trial court makes a preliminary determination that the non-moving party has established a *prima facie* case of *in personam* jurisdiction, such determination does not relieve the non-moving party of the burden of proving, in its case in chief at trial, the existence of facts upon which jurisdiction is based by a preponderance of the evidence. *United States* v. *Montreal Trust Co.* (C.A. 2, 1966), 358 F. 2d 239, 242, certiorari denied (1966), 384 U.S. 919; and *KVOS, Inc.* v. *Associated Press* (1936), 299 U.S. 269. If, by the end of trial, such non-moving party fails to prove the existence of *in personam* jurisdiction, the trial court must, upon renewed motion of the party challenging the court's jurisdiction, dismiss the claim without prejudice. *Forsythe* v. *Overmyer* (C.A. 9, 1978), 576 F. 2d 779; and see *Professional Investors*

*Life Ins. Co.* v. *Roussel* (D.C. Kan. 1978), 445 F. Supp. 687, at 697.

[3] The position taken by the dissent, that the trial court's decision should be affirmed, is expressly based in part upon the argument that the appellant's affidavit was not certified in accordance with law, and that the appellant failed to attach to the complaint a copy of the agreement containing the provision for medical care, if indeed this agreement was reduced to writing. The record does not disclose objection by appellee to either of these minor procedural errors in the common pleas court; no objections having been made, the errors were waived, and the complaint and affidavit were properly considered by the trial court. *Brown* v. *Ohio Cas. Ins. Co.* (1978), 63 Ohio App. 2d 87 [17 O.O.3d 267].

The appellant agreed to play football for appellee, and expressed his assent by executing an Inter-Conference Letter of Intent. At some unspecified time and place, the appellee promised "that any injury that [appellant] would receive would be properly taken care of and that he would receive proper medical care and attention for any injuries that he might receive during the course of playing football or engaging in any athletic competition on behalf of the University of Virginia."

In 1973, appellant broke his wrist while playing football for appellee. Appelle's medical staff taped appellant's wrist, and thereafter, provided no medical attention or care for the injury. Appellant continued to play and participate in athletic events on behalf of appellee. In 1975, appellant's wrist was operated upon at the University of Virginia. Thereafter, appellant returned to his residence in East Cleveland.

After arriving in the Cleveland area, appellant was confined in the Cleveland Clinic, and had a second operation performed upon his wrist. Appellant's wrist remained in a cast for thirteen months, rendering him unable to work, and requiring him to receive welfare benefits. Appellant is now permanently disabled.

Appellant contends on appeal that the appellee transacted business in Ohio, within the meaning of R.C. 2307.382, and that by so doing appellee subjected itself to a constitutional assertion of the long-arm jurisdiction of the Ohio courts.

The phrase "transacting any business" from R.C. 2307.382, is a term of art. It was taken from the Illinois long-arm statute, which had been interpreted by the Supreme Court of that state as extending the personal jurisdiction of the Illinois courts to its constitutional limits. *Nelson* v. *Miller* (1957), 11 Ill. 2d 378, 143 N.E. 2d 673. The federal Court of Appeals for the Sixth Circuit has expressly held that:

"[W]e can conclude that the Ohio legislature intended to extend the jurisdiction of its courts to the Constitutional limits with respect to subsection (A)(1) [of R.C. 2307.382]." *In-Flight Devices Corp.* v. *Van Dusen Air, Inc.* (C.A. 6, 1972), 466 F. 2d 220, 224 [65 O.O.2d 279].

The constitutional limits on the exercise of personal jurisdiction by a state court were described by the Ohio Supreme Court in the following passage:

"The requirements of the due-process clause can be stated simply: There must be sufficient service of process such as to be reasonably likely to communicate the fact of the commencement of an action to a nonresident; and, there must be some nexus between the forum for the action and the nonresident so as to make it fair and reasonable for the nonresident to appear in that forum and defend the action." *Wainscott* v. *St. Louis-San Francisco Ry. Co.* (1976), 47 Ohio St. 2d 133, 137 [1 O.O.3d 78].

The opinion of the court in *Wainscott* contains an exhaustive and scholarly review of the pertinent decisions of the United States Supreme Court from *Lafayette Ins. Co.* v. *French* (1855), 59 U.S. 404, to *International Shoe Co.* v. *Washington* (1945), 326 U.S. 310. The Ohio Supreme Court adopted the following standard for determining whether an Ohio court was entitled to exercise personal jurisdiction over a defendant:

"The sole issue is whether it is fair and reasonable for the appellant to appear and defend this action in the courts of Ohio." 47 Ohio St. 2d at 137.

In *International Shoe Co.* v. *Washington, supra,* the United States Supreme Court clearly indicated that, under the Constitution, a foreign corporation which conducts activities within a state may thereby subject itself to the personal jurisdiction of the courts of that state:

"It is evident that the criteria by which we mark the boundary line between those activities which justify the subjection of a corporation to suit, and those

which do not, cannot be simply mechanical or quantitative. * * *

"Whether due process is satisfied must depend rather upon the quality and nature of the activity in relation to the fair and orderly administration of the laws which it was the purpose of the due process clause to insure. That clause does not contemplate that a state may make binding a judgment *in personam* against an individual or corporate defendant with which the state has no contacts, ties, or relations. Cf. *Pennoyer* v. *Neff* [95 U.S. 714], *supra; Minnesota Commercial Assn.* v. *Benn,* 261 U.S. 140.

"But to the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue." 326 U.S. at 319.

In *McGee* v. *International Life Ins. Co.·* (1957), 355 U.S. 220, the Supreme Court held that a foreign corporation may become subject to the personal jurisdiction of the courts of a state on the basis of a single business transaction carried on within that state. The defendant in that case had issued a single insurance policy in the state of California, and accepted premiums from the policyholder. The court held that in spite of the limited nature of the defendant's activity within the forum state, the defendant was subject to suit in California on a cause of action arising out of the insurance contract. In *Hanson* v. *Denckla* (1958), 357 U.S. 235, the Supreme Court held that where a corporation "purposefully avail[s] itself of the privilege of conducting activities within the forum State," it becomes subject to suit within the state, at least with respect to matters related to its activities. 357 U.S. at 253.

In its most recent pronouncement on this issue, *World-Wide Volkswagen Corp.* v. *Woodson* (1980), 444 U.S. 286, the court held that in determining whether the exercise of jurisdiction over a defendant would be fair and reasonable, the following factors should be considered:

"Implicit in * * * [the] emphasis on reasonableness is the understanding that the burden on the defendant, while always a primary concern, will in an appropriate case be considered in light of other relevant factors, including *the forum State's interest in adjudicating the dispute,* see *McGee* v. *International Life Ins. Co.,* 355 U.S. 220, 223 (1957); *the plaintiff's interest in obtaining convenient and effective relief,* see *Kulko* v. *Superior Court, supra,* 436 U.S. at 92, at least when that interest is not adequately protected by the plaintiff's power to choose the forum, cf. *Shaffer* v. *Heitner,* 433 U.S. 186, 211, fn. 37 (1977); *the interstate judicial system's interest in obtaining the most efficient resolution of controversies; and the shared interest of the several States in furthering fundamental substantive social policies,* see *Kulko* v. *Superior Court, supra,* at 93, 98." (Emphasis added.) 444 U.S. at 292.

The Supreme Court further stated that "foreseeability" plays a role in due process analysis; where a defendant should, by his conduct and his connection with a forum state, "reasonably anticipate being haled into court" in the forum state, an assertion of jurisdiction over the defendant does not offend due process. 444 U.S. at 297.

Analyzing the facts presented in the case at bar in the light of these principles, it is apparent that there were sufficient "minimum contacts" between appellee and the state of Ohio to justify the exercise of personal jurisdiction over the appellee. It is apparent from the evidence that appellee, through its agents, aggressively pursued the appellant within the state of Ohio in an effort to induce appellant to play football for appellee University of Virginia. By its conduct, ap-

pellee demonstrated an intent to effect certain consequences within the state of Ohio, namely, to cause an Ohio resident to attend college and play football for appellee. We find it evident from the record that appellee "purposely availed itself" of the privilege of acting in Ohio. *Hanson v. Denckla, supra.*

We are also persuaded that the appellant's cause of action "arise[s] out of or [is] connected with the activities" of the University of Virginia within the state of Ohio. *International Shoe Co.* v. *Washington, supra.* The appellee induced appellant to leave Ohio to perform in athletic contests in its behalf. The obvious purpose of the alleged promise of medical care was to encourage the appellant to exert himself to the fullest in football. Appellant's promise, made in Ohio, to attend and perform for the appellee university is manifestly connected with the alleged agreement by appellee to provide medical care.

Finally, taking into account the relevant factors listed in *World-Wide Volkswagen Corp.* v. *Woodson, supra,* we find that the exercise of personal jurisdiction over the appellee is fair and reasonable. The appellee, University of Virginia, should have foreseen that by intensively recruiting an Ohio high school athlete, it might become subject to lawsuits in the state of Ohio for causes of action arising out of promises made to the athlete. The burden imposed upon the corporate appellee to defend this litigation in Ohio is slight compared to the burden that would be imposed on the individual appellant, who was receiving welfare benefits, to bring suit in Virginia. The state of Ohio has a substantial interest in protecting the welfare of its residents, particularly those who, because of their youth or lack of experience, may be susceptible to unfair business practices. Finally, the efficient resolution of disputes, such as that presented in the case at bar, is more likely to be achieved, if the state courts exercise jurisdiction in cases involving the recruitment of the resident student athletes of that state. This would permit the residents of the state, and the colleges recruiting within the state, to determine with some degree of certainty what law will govern their relationship.

The United States District Court for the Southern District of Ohio has released a decision on all fours with the view expressed in this opinion. *Garrett* v. *Ruth Originals Corp.* (S.D. Ohio 1978), 456 F. Supp. 376 [10 O.O.3d 430]. The defendants in that case were a corporation and its president, both of North Carolina. A vice-president of the corporation telephoned the Ohio plaintiff and requested him to apply for a job with the defendant-corporation. Plaintiff visited the defendant's offices in North Carolina on two occasions, and agreed to work for the defendant in a subsequent phone call placed by the vice-president to the plaintiff in Ohio. The plaintiff moved to New York to work for the defendant-corporation. Several months later his employment was terminated, and he returned to Ohio. The district court found that the exercise of personal jurisdiction over the corporate defendant would not offend " 'traditional notions of fair play and substantial justice,' " *International Shoe Co.* v. *Washington, supra,* 326 U.S. at 316. The court specifically held that the actions of the corporation in entering into a contract with an Ohio resident met the purposeful action requirement. 456 F. Supp. at 380.

The dissent concludes that the purposeful action requirement of *Hanson* v. *Denckla, supra,* was not met in the case at bar because the action of the university did not have "a realistic impact on the commerce of [the forum] state," as is required under *Southern Machine Co.* v. *Mahasco Industries, Inc.* (C.A. 6, 1968), 401 F. 2d 374, 381. The "impact" of the defendant's activities upon the state need not be extensive; it must only be realistic, as opposed to fanciful or imaginary.

Jurisdiction may be predicated upon the existence of a single contact between the plaintiff and the defendant, if the defendant purposefully acted within the forum state. *McGee* v. *International Life Ins. Co., supra; Garrett* v. *Ruth Originals Corp., supra.*

It cannot be seriously maintained that college football is not a business, or that the relationship between a college and a student-athlete is not a business relationship. The letter of intent signed by the appellant provided for a substantial penalty for early withdrawal from the football program:

"3. After signing the Inter-Conference Letter of Intent with one institution, should a student-athlete elect to enroll at another institution which is a participant in the Inter-Conference Letter of Intent Plan but not a member of the same Conference, the institution in which he enrolls may not be represented in athletic competition by that student-athlete until he shall have been in residence two years and in no case for more than two years of varsity competition in any sport * * *.

"4. After signing an Inter-Conference Letter of Intent with one institution, should a student-athlete elect to enroll at another institution which is a member of the same Conference, his athletic eligibility at the institution in which he enrolls will be limited in accordance with the regulations of that Conference."

It is well established in law that the relationship between a student and a college is contractual in nature. *Behrend* v. *State* (1977), 55 Ohio App. 2d 135 [9 O.O.3d 280]; *Andersen* v. *Regents of Univ. of Cal.* (1972), 22 Cal. App. 3d 763, 770, 99

Cal. Rptr. 531; *Booker* v. *Grand Rapids Medical College* (1909), 156 Mich. 95, 120 N.W. 589; see, also, J. F. Buchter, Contract Law and the Student-University Relationship, 48 Ind. L.J. 253, 262. This contract doctrine is particularly applicable to college athletes who contract by financial aid or scholarship agreement to attend college and participate in intercollegiate athletics. See Comment, The Authority of a College Coach: A Legal Analysis (1970), 49 Ore. L. Rev. 442, 447. In *Begley* v. *Corp. of Mercer Univ.* (E.D. Tenn. 1973), 367 F. Supp. 908, the district court determined that the relationship between the defendant college and the plaintiff-athlete was governed by the law of contracts where the evidence revealed that the college promised to provide monetary aid in exchange for the athlete's promise to abide by NCAA regulations and to participate in the college's intercollegiate basketball program. In *Taylor* v. *Wake Forest Univ.* (1972), 16 N.C. App. 117, 191 S.E. 2d 379, the Court of Appeals of North Carolina similarly found that the plaintiff-athlete was contractually required to attend football practice, to maintain his right to an athletic scholarship.

Nor is it a bar to the exercise of personal jurisdiction that the appellee is a non-profit corporation. In construing the word "business" in the context of other long-arm statutes, courts in other states have held that the activities of a non-profit corporation may render the corporation subject to an assertion of long-arm jurisdiction. *Novack* v. *National Hot Rod Assn.* (1967), 247 Md. 350, 231 A. 2d 22; *Carlson Corp.* v. *Univ. of Vermont* (Mass. 1980), 402 N.E. 2d 483.[4]

---

[4] In defining the term "business" for purposes of long-arm statutes, the subtle complexities of modern day commercial relationships must be given adequate consideration. In construing the "transacting business" provision of the Illinois long-arm statute, the Seventh Circuit Court of Appeals stated:

"The test of whether business was transacted within the state must be applied in the context, not of communication and transportation criteria of yesteryears, but of modern day commercial and personal accelerated relationships. * * *" *O'Hare International Bank* v. *Hampton* (C.A. 7, 1971), 437 F. 2d 1173, 1177.

While the record in the case at bar fails to elaborate on the nature of the appelle's intercollegiate football program, recent characterization of intercollegiate football and other intercollegiate sports activities as big business can hardly be considered unfair.[5]

It is also common knowledge that college football programs generally depend for their success on the recruitment of outstanding athletes from out-of-state. In 1980, it was reported that in 1971-72 the Atlantic Coast Conference of the NCAA, of which appellee University of Virginia was a member, recruited nearly half of its student-athletes from non-conference states, depending heavily upon students from New York, Georgia, Illinois and Ohio. J. Rooney, The Recruiting Game, at 112-114.

It is the considered conclusion of this court that, for purposes of this lawsuit, the appellee subjected itself to the jurisdiction of the Ohio courts, when it purposely entered this state and recruited the appellant to play football for the University of Virginia. The first error assigned by appellant is well taken.

The appellant contends in his second assigned error that the trial court erred in ruling upon the appellee's motion to dismiss without holding an evidentiary hearing.[6] In *Jurko* v. *Jobs Europe Agency, supra* (43 Ohio App. 2d), at 87, this court stated that "* * * [w]hile it is preferable for the [trial] court to hold a hearing on the factual issue of personal jurisdiction and [such is] contemplated under Civ. R. 12(D), it is within a court's discretion in an appropriate case to decide a Civ. R. 12(B)(2) jurisdictional challenge solely on the unopposed allegations of defendant's affidavit."

Since neither the pleadings nor the affidavits in the case at bar raised any factual disputes, we find that the trial court did not abuse its discretion in ruling on the motion without holding a hearing. The second assigned error is overruled.

Accordingly, for the reasons set forth in disposition of appellant's first assigned error, the decision of the trial court is reversed and the case is remanded for further proceedings consistent with this opinion.

*Judgment reversed and case remanded.*

DAY, J., concurs.
KRUPANSKY, J., dissents.

Appendix to Majority Opinion

In 1969, it was reported that at seventy-five percent of the universities maintaining NCAA "Class A" football athletic programs, program revenues exceeded program costs. J. Koch, The Economics of "Big-Time" Intercollegiate Athletics, 52 Soc. Sci. Q. 248, 258:

"When the athletic program depends largely upon self-generated income (gate receipts or contributions from outside the institution) the business aspects of running the program — the cost factors — become even more crucial, and there is greater likelihood that any personal expense will be looked upon as an employee wage expense."

H. Cross, The College Athlete and the Institution, 38 Law & Contemp. Prob. 151 (1973):

"* * * If substantial portions of the expense of the program must be self-generated or secured from outside of the institution, there is pressure for income-producing 'spectator' sports. This may cause difficulty in maintaining institu-

---

[5] See Appendix for collection of secondary source materials describing the commercial aspects of college football.

[6] The second assignment of error provides:

"The court committed prejudicial error in deciding the motion to dismiss based upon the affidavits which show that it was a factual dispute."

tional control sufficient to keep the program effectively contributing to the broad educational purposes of the institution. * * *" *Id.* at 163.

"* * *

"The pressure to produce winning teams increases efforts to recruit for athletic purposes. 'Recruiting is the name of the game' is the cliche reflecting the necessity to have a team of superior athletic ability to win. The important variable is likely to be the ability of team members rather than the quality of the coaching or the desire to win. * * *" *Id.* at 155. (Footnote omitted.)

In providing an economic analysis of "big-time" athletic programs the following observations were made in J. Koch, *supra,* at 250-253:

"The Production Function

"The firm in the intercollegiate athletic market is the individual college or university (henceforth 'university' for brevity). The production function of the firm is somewhat unusual in several respects. The unit of output of the firm is the competitive game between its own athletic team and that of a rival university-firm. Each unit of output (game) is differentiated in nature. * * * [T]he number of consumers of the same unit of output is virtually unlimited.

"The university-firm's output and the streams of utility which emanate therefrom are strikingly similar to the circumstance of admittedly professional athletics. Indeed, there would be little reason to examine separately the intercollegiate athletic market if the emphasis were to be upon the output of that market. * * * However, the distinctive and noteworthy features of the intercollegiate athletic market lie not on the output side of the market, but rather on the input side of the market and in the rules and regulations which govern the procurement and use of inputs.

"The inputs in the production function include the student-athletes who compete, the stadiums, playing fields and facilities, the coaches, trainers, etc., the equipment and supplies (pep pills, steroids and amphetamines, some would contend), and the indispensable element of competition personified by the other team. * * *

"The market for student-athlete inputs may be characterized as one in which a seller (the student-athlete) with partial monopoly power due to limited supply and product differentiation faces potentially many buyers (universities) who are at least partial monopsonists. The university-firms can influence the price of the student-athlete input, but only up to a certain flexible maximum price. That flexible maximum price allows no payment to a student-athlete in excess of tuition, fees, room and board, books and necessary supplies, and $15 per month for laundry expenses.

"*The structural keystone of the market for student-athlete inputs is the national letter of intent.* Once a prospective student-athlete who otherwise qualifies for financial aid signs a letter of intent with a given university-firm, he is bound to that university-firm for the space of one year and he may not sign with, nor be signed by, any other university-firm. This provision effectively forecloses all other university-firms from competing for that student-athlete input. Should a student who signs a national letter of intent at State U. decide after his freshman year to transfer to Ivy U., he must sit on the sideliness [*sic*] without competing for one calendar year. The national letter of intent is properly seen as a cartel contract which, if not fulfilled by either party to the contract, results in substantial penalties being levied by the NCAA." (Emphasis added, footnote omitted.)

In this context, Professor Horn makes the following additional observation in Intercollegiate Athletics: Waning Amateurism and Rising Professionalism, 5 J. Coll. & U.L. 97, 97-98:

"Too often the jockeying for power within the NCAA has reflected the

economic positions between institutions rather than concerns about what should be the basic purpose of the organization: the protection of student-athletes from unscrupulous actions by those who would exploit them for their own purposes. * * *

"* * *

"This situation is not the result of an organized attack on the young athlete. It is evidence of the creeping avarice that has overtaken the professional and amateur marketplaces with the growth of the American interest in sports, the expansion of leagues and teams, and the construction of stadia. The demand is for superior athletes who can make the big plays, win the game, and attract hundreds of thousands and (in the instance of televised collegiate and professional games) millions of paying customers. The ultimate beneficiaries are the commercial sponsors which buy the air time and purchase the advertisements in newspapers and magazines. *But the chain of causation begins back on the playing fields of the junior and senior high schools and the colleges and universities all across this country.*" (Emphasis added.)

The impact of telecommunications upon intercollegiate football has not gone unnoticed by commentators such as P. Hochberg & I. Horowitz, Broadcasting and CATV: The Beauty and the Bane of Major College Football, 38 Law & Contemp. Prob. 112:

"Amateur sports, particularly major college football, are an object of nationwide interest. With the cooperation of individual colleges, the National Collegiate Athletic Association (NCAA) and the government, television networks and sponsors have been able to exploit this interest to create a business the economic importance and implications of which are not inconsiderable. Indeed, in 1972 broadcasters spent an estimated $19 million for television and radio rights to regular-season telecast dates; corporate giants such as Chevrolet, Continental Insurance, Goodyear, Holiday Inns, Miles Laboratories, Miller Brewing, Motorola, Texaco, Traveler's Insurance, and U. S. Tobacco spent $52,000 to send a minute commercial message to an average of over eight million TV homes; and the more familiar football-playing colleges, from Big Ten doormats to Big Eight powerhouses, each received in the neighborhood of $215,000 in regular-season broadcast fees."

KRUPANSKY, J., dissenting. I respectfully dissent from the majority's reasoning and conclusion in the first assignment of error. I do not believe the evidence before this court establishes facts which satisfy the test for obtaining personal jurisdiction over appellee.

Where the trial court's personal jurisdiction has been challenged, *e. g.*, by a motion to dismiss, the burden of establishing jurisdiction rests upon the party asserting the existence of jurisdiction. This burden must be met by a *prima facie* showing of personal jurisdiction. See *Jurko* v. *Jobs Europe Agency* (1975), 43 Ohio App. 2d 79 [72 O.O.2d 287], paragraph two of the syllabus; *Welsh* v. *Gibbs* (C.A. 6, 1980), 631 F.2d 436, 438 [19 O.O.3d 333]. Hence, in the case *sub judice* appellant has the burden of making a *prima facie* showing that the trial court has personal jurisdiction over appellee.

In his complaint, appellant bases his claim on appellee's alleged promise to provide proper medical care for any injuries appellant received while playing football for appellee. However, appellant's complaint does not state where or when the promise was made, by whom it was made, nor does it state whether the promise was oral or written. If the promise was written, the complaint is defective under Civ. R. 10(D), which states: "When any claim or defense is founded on an account or other written instrument, a copy thereof must be attached to the pleading. If not so attached, the reason for the omission must be stated in the pleading."

If the agreement was oral, appellant failed to name an individual acting on

behalf of the defendant university with whom the agreement was made. Appellant's complaint merely states, "[T]he defendant agreed * * * that he [appellant] would receive proper medical care * * *." The named defendant is the University of Virginia. It would be difficult, if not impossible, for the defendant to submit a signed rebuttal affidavit to support its motion to dismiss based upon the information supplied by appellant.

Although appellant filed an affidavit in response to appellee's motion to dismiss, he again failed to state whether the promise was oral or written, when it was made, by whom it was made and whether it was made while either party was in Ohio. A copy of the letter of intent is attached to the affidavit, but it does not include a promise to provide proper medical care. Appellant's affidavit states the application for a grant in aid and the letter of intent were signed in Ohio, but those documents do not provide the basis for appellant's claim. In fact, appellant's affidavit makes no mention whatsoever of appellee's alleged promise to provide proper medical care to appellant.

Additionally, the affidavit is defective since it is not properly certified. Affidavits used to present testimony to a court must be authenticated in the same way as a deposition. R.C. 2319.04. The requirement for certifying a deposition is set forth in Civ. R. 30(F)(1):

"Upon request of any party or order of the court the officer shall transcribe the deposition. When he transcribes the deposition *he shall certify on the deposition that the witness was fully sworn or affirmed by him* and that the deposition is a true record of the testimony given by the witness. * * *" (Emphasis added.)

In the case *sub judice,* there is no statement certifying that the affiant was sworn by the notary. Nor does the notary certify that the affidavit was subscribed in his presence by the affiant. See *Ashley* v. *Wright* (1869), 19 Ohio St. 291, 296.

Due to the improper certification and lack of substantive averments in the affidavit, the court must rely on the unsupported allegations in the complaint. Therefore, even when viewed in a light most favorable to appellant, he has failed to sustain his burden of proof by making a *prima facie* showing of personal jurisdiction.

The majority concludes appellee is subject to the personal jurisdiction of the trial court under Civ. R. 4.3(A) and R.C. 2307.382(A)(1) since appellee transacted business in Ohio and the cause of action arose out of such transaction. In *Southern Machine Co.* v. *Mohasco Industries, Inc.* (C.A. 6, 1968), 401 F.2d 374, 382, the court stated:

"[B]usiness is transacted in a state when obligations created by the defendant or business operations set in motion by the defendant have *a realistic impact on the commerce of that state*; and the defendant has purposefully availed himself of the opportunity of acting there if he should have *reasonably foreseen that the transaction would have consequences in that state.*" (Emphasis added.)

In the case *sub judice,* neither requirement is satisfied. The majority goes to great lengths to show college football is a big business and an agreement by a student to play football for a university in exchange for financial aid is governed by the law of contracts. According to the majority, the contract between the parties is a business transaction and the transaction has a realistic impact on commerce. However, the majority opinion falls short of showing the transaction has a realistic impact on commerce *in Ohio* as required under *Southern Machine Co., supra.*

The majority relies upon *Garrett* v. *Ruth Originals Corp.* (S.D. Ohio 1978), 456 F. Supp. 376 [10 O.O.3d 430]. This reliance is misplaced. In *Garrett,* the court, at page 381, stated:

"The performance of the contract of employment was chiefly to take place in New York, but it also required that the plaintiff leave his established position of

employment and place of residence in Ohio. Such a departure would have an unavoidable impact upon the commerce of Ohio which differs in kind from the simple case where a forum resident contracts with an out of state resident to perform wholly out of state services, but the forum resident maintains his residence or place of business within the forum. *In the latter case, the only impact upon the state is the creation of a duty owed to one of its residents.* In the instant case, that impact exists plus the effect of the plaintiff withdrawing his human capital from the state." (Emphasis added.)

The court in *Garrett* clearly distinguishes the facts before it from the situation, such as in the case *sub judice,* where the business transaction creates an obligation or a duty without removing or creating commercial activity in Ohio. The language in *Garrett* limits its holding to cases where the business transaction requires an Ohio resident to leave established employment in Ohio. A realistic impact on commerce in Ohio is also made when the transaction *creates* commercial activity. *Welsh* v. *Gibbs, supra.*

The agreement between Barile and the University of Virginia neither removes nor creates commerce within the state of Ohio. There is no evidence in the record to indicate appellant was employed when he entered into the agreement with appellee. Appellant's fulfillment of the agreement, *i.e.,* playing college football, was not performed in Ohio, nor is there evidence in the record to show the commercial activity which allegedly resulted had any effect on commerce in Ohio. Therefore, the first requirement set forth in *Southern Machine Co., supra,* is not satisfied.

Likewise, the second requirement in *Southern Machine Co., supra,* is not satisfied. There is absolutely no evidence to indicate appellee should have reasonably foreseen that the transaction would have consequences in Ohio.

Therefore, since appellee neither transacted business in Ohio nor purposely availed itself of the opportunity of acting in Ohio, the trial court does not have personal jurisdiction over appellee. Since the record reveals appellant's father was present at all of the meetings between appellant and appellee's representative, and appellant's father signed the application for a grant in aid and the letter of intent, there is no reason to believe appellant needs special consideration due to his youth.

In summation, I find appellant's first assignment of error to be without merit for the following reasons:

1. The complaint does not specify whether the promise to provide proper medical care was oral or written.

2. Appellant's affidavit does not allege appellee promised to provide proper medical care.

3. Appellant's affidavit is not properly certified.

4. The alleged promise does not constitute a transaction of business in Ohio since it had no realistic impact on commerce in Ohio.

5. The alleged promise does not constitute a transaction of business in Ohio since appellee could not have reasonably foreseen consequences in Ohio.

Accordingly, appellant's first assignment of error should be overruled. I agree with the majority in its conclusion on the second assignment of error and would, therefore, affirm the holding of the trial court.